ANNIE JAMES, ADM'X. v. THE EMMET MINING COMPANY.

*Negligent injury—Declaration—Fellow-servants—Res gestæ—Right of ad-*
*ministrator to sue.*

1. A declaration for negligent injury is not demurrable for failing to
   state that the injured person did not know of the danger, if it does
   aver that he was without fault.

2. *Actio personalis moritur cum persona* is not a constitutional maxim;
   and the Legislature can give the representative of one who has been
   killed by negligent injury the right to sue therefor.

3. A declaration for a negligent injury caused by the caving-in of the
   surface over a mine will cover a case in which the caving-in was due
   in part to the insufficiency of lateral supports, and need not be con-

fined to one in which the surface fell in because of the removal of that on which it rested.

4. A common workman employed about a mine but not himself a miner, is not a fellow-employee of the miners in any such sense that he cannot recover for an injury caused him by the mining operations. And his employer is bound to see that the premises where he works are reasonably safe.

5. Where an accident in a mine indicated danger and was followed three days later by another which did fatal injury, the acts and statements of the mine officers meanwhile in relation thereto were continuous parts of the res gestæ.

6. In an action for fatal injury the jury may properly consider how far the victim had knowledge of the danger and how far he relied on the action and the presumed knowledge of his superiors.

7. An employee has a right to assume that it is safe to do what he is hired to do unless his knowledge warns him it is not.

8. An administrator's right to sue for a fatal injury to his decedent is sufficiently established as against strangers by the letters of administration granted him by the proper court; and in the case of one who, as decedent's widow, has been appointed administratrix, the legality of her marriage cannot be questioned in an action by her for an injury to her decedent.

Error to Menominee. (Grant, J.)    Oct. 22.—Nov. 19.

CASE.   Defendant brings error.   Affirmed.

*B. J. Brown* and *Ball & Hanscom* for appellant. In case for negligent injury the plaintiff must prove that the injury was caused by the negligence alleged in the declaration, and must recover, if at all, upon the case made by the declaration : *Marq., Hought. & Ont. R. R. Co. v. Marcott* 41 Mich. 433 ; *F. & P. M. Ry. Co. v. Stark* 38 Mich. 714 ; *Batterson v. C. & G. T. Ry. Co.* 49 Mich. 184 ; and it will not do to allow the jury to render a verdict upon mere possibilities or conjecture : *Quincy Mining Co. v. Kitts* 42 Mich. 41 ; the superintendent of a mine does all that is required of him when he has chosen skilled workmen to see that no defects exist that care can guard against : *Mich. Central R. R. Co. v. Dolan* 32 Mich. 510 ; *Mich. Central R. R. Co. v. Gilbert* 46 Mich. 176 ; *Smith v. F. & P. M. Ry.* 46 Mich. 258 ; *Mich. Central R. R. v. Austin* 40 Mich. 247 ; *Malone v. Hathaway* 64 N. Y. 5 ; *Wilson v. Merry* L. R. 1 Scotch & Div. App. 326 ; *Feltham v. England* L. R. 2 Q. B. 33 ; *Murphy v. Smith*

19 C. B. (N. S.) 361; *Gallagher v. Piper* 16 C. B. (N. S.) 668; to represent the principal in such cases, when the question of liability to employees arises, one must be in the entire control of the business, as fully as the principal would be if present, and not a mere foreman or manager of some portion of it: Wharton on Neg. §§ 222, 223; 2 Thomp. Neg. 1030, 1031; *Hall v. Johnson* 3 H. & C. 589; *Lehigh Valley Coal Co. v. Jones* 86 Penn. St. 432; *Hanrathy v. N. C. Ry.* 46 Md. 280; and one who is employed by an independent contractor and is not under the control of the principal or his representatives, is not a fellow-workman: *Burke v. Nor. & Wor. R. R.* 34 Conn. 474.

*Kruse & Flannigan* and *F. O. Clark* for appellee.

CAMPBELL, J.   This action was brought under the statute to recover damages for the death of Thomas James, claimed to have been caused by the negligence of his employers.   He was a laborer, and not a miner, and was employed on work of various kinds about their mine and premises.   His death was caused by caving in of the surface over the mine, where he was at the time engaged in removing pumping apparatus and pipes from the mine, where work was, or was about to be, abandoned.   Upon the surface over the vein, which ran east and west, there were a shaft-house over the shaft nearest to the place of the accident, a boiler-house about a hundred feet west of the shaft, and an engine house west of that. The surface gave way from the shaft to this engine-house, taking down the boiler-house into the mine, making a hole about sixty feet wide by a hundred long at the surface, and about sixty long by twenty-five feet wide at the top of the rock below the sand and gravel that covered it for a depth of about twenty-five feet.   This mass of surface matter, with more or less rock and ore, filled up a considerable space in the mine, and the bodies of the persons carried down with it were not found.   One person only was found alive in the upper part of the mine.

The plaintiff's theory, which prevailed with the jury, was that the mine caved in because not adequately supported. And the immediate cause is said to have been the removal of

the under part of a pillar of ore, and the insufficient manner in which the pillar thus undermined was propped up. There had been a partial caving away of this pillar in the year 1882. This surface caving in happened on Monday, April 10, 1883. On the 7th day of the same month (the Friday before) this pillar gave way, and from that time until the accident there were, as is claimed by the plaintiff's witnesses, a series of fallings of ore and other material, and appearances indicating danger of some kind, which made it improper to set men at work over this part of the mine. There is less conflict on the actual appearances in the mine than upon some other questions, but there is some conflict of testimony upon several points. The errors assigned cover many specified objections, but are chiefly aimed at what are claimed to be misrulings on the case as it stood on the close of the proofs. Some, however, relate to other matters, which may properly be considered in the beginning.

The declaration was demurred to, originally, on the single ground that it did not aver that the dangerous condition of the premises was unknown to plaintiff's intestate in season to have avoided the danger. The declaration, however, avers expressly that he was without fault, and this would cover want of knowledge, provided want of knowledge would be decisive. On the trial of such a case proof of knowledge, under such circumstances as to place the intestate in fault by reason of it, might be a complete defense. But it is not necessary here to decide whether a man having some knowledge of danger may not, nevertheless, be blameless when incurring it in the course of employment at which he is set, or must always be deemed negligent when doing so; because an allegation of entire want of fault is as broad as it could well be made.

There is, however, a further assignment of error, which claims the declaration to be insufficient because of the invalidity of the statute giving a cause of action in such cases. We are unable to see any force in this suggestion, and it is not rested on authority. The maxim of the common law, that a personal action dies with the person, is not a constitu-

tional maxim. The death of the injured person does not destroy the fault of the wrong-doer. There was a period in early English history when death by wrong always involved pecuniary redress. And although for a long time that policy was generally changed, its change was never, so far as we know, based on any idea of want of power in the Legislature to restore it. As the party injured has become incapable of receiving redress in person, it must, if granted, go to some one who represents him; and if the Legislature see fit to allow the personal representative to sue, and collect damages for the benefit of those relatives and connections who take the personalty when distributed, we cannot see why this is improper. This statute, although in some respects modified, was in force when our present Constitution was adopted. Its general policy has been adopted in England as well as in America, and is not entirely confined to these countries. It is for the Legislature, and not for the courts, to devise safeguards, if further ones are needed. We think the law is valid.

In order to see the bearing of other assignments, some reference will be proper to the general outline of the case. The defendant company owned an iron mine in Menominee county, with a vein running east and west, and inclining somewhat from north to south in its general course. It had been opened westward from the shaft before referred to about 170 feet on the adit or upper level, and downward to third level below it, and the ore had been removed through this territory to a considerable extent. The vein, if it can be so called, was nearly perpendicular in this part of the property on the southerly side, the south wall sloping slightly outward towards the south for about half way down, and then turning a little the other way from the perpendicular so as to overhang slightly as far down as the lower level,—where the vein practically ran out. The ore vein, which was narrow at the top, being about 18 feet wide where it reached the earth above, did not widen very much until it reached the lower edge of a hanging wall of rock and ore mixed, which from the scale on the diagrams seems to have reached down about 125 feet from the top of the rock, and not far from 150 feet

from the surface of the ground. This deep, wedge-shaped hanging rock, called in mining language a horse, penetrated into the ore vein throughout its course, the vein pinching together about 170 feet west of the shaft. A considerable part of it went down when the mine caved in. Below this wedge the vein widened so as to be at the first level below it, according to defendant's witnesses and diagrams, about 65 feet wide, running up also behind the horse to the junction of that with the north wall or what is known as the hanging wall, and sloping and narrowing downward from its widest point to the lowest level, about 130 feet. These distances are not material, but are variously given. In mining out the ore there were parts of the ore vein left substantially un-touched from wall to wall at intervals, the parts so left being of uniform thickness and the one in question being 18 feet thick, and filling the entire width of the vein. These cross-sections of ore were called pillars, and their object was to keep the walls from crushing together, and thus supporting the mine. The witnesses do not in terms agree how far such support existed, but plaintiff's witnesses testified to its impor-tance in keeping the whole upper part of the mine from depression. The pillar in question here was about twenty feet west of the shaft, and the ore had been worked out on both sides of it, leaving open spaces east and west. The pillar itself did not reach the extreme top of the mine, and above the level called the first level, the ore had been taken out, but just how much is perhaps doubtful. The only open-ings from east to west through this pillar were the usual pas-sage-ways and drifts. The hanging wall was hard jasper, and the foot-wall soap-stone of apparently not very tough quality. The ore itself was according to most of the testi-mony a not very compact or tenacious soft iron ore, which, however, required to be blasted.

Having removed the ore on either side of this pillar and the mine having become to a large degree worked out at this part of it, the managers were proceeding to remove what was left in the pillars, or so much as they could safely remove,— the process being called scramming, or robbing the mine, by

several of the witnesses. To do this they began at the bottom of the pillar and worked upward towards the surface, taking away the ore by blasting, and putting in timber-work in its place. At the time when this trouble arose, this work was being done near the second level below the adit or uppermost level, or about 200 feet down from the surface of the ground where the vein was about 40 feet wide.

In mining out the ore, where the vein was narrow, the stopes or workings were roofed over by logs laid angling from wall to wall, with their lower ends notched into the foot rock. Where the vein widened out below the horse, this was impracticable and insufficient, and the spaces between the pillars from side to side were filled with a series of timber-work consisting of thick logs about 20 feet long, set upon legs of heavy timber about 8 feet high, the ends of which were mortised into the timbers at the top and bottom. These were arranged in parallel rows with substantial cross-timbers running the other way so as to fill up the entire open space from side to side. They were also wedged and filled in, both against the pillars and against the vein-walls, with logs of such size as were meant to keep them firm. These timber rooms or frames were designed to give lateral support to the ore-pillars as well as to keep the whole mine firm. The witnesses do not all agree concerning the functions and importance of this timbering. But it was testified and seems probable that it was important to keep it so firmly fixed as to prevent swaying or yielding.

In removing the bottom of the pillar this same plan was pursued, except that it is claimed the timbering was more solid, and was arranged so as to be less likely to yield. The details are not important for the present discussion.

It appeared that this method of timbering mines was not in common use on Lake Superior, but there was testimony that it had been used elsewhere, but whether with mineral veins and walls of similar contents and consistency the record does not very distinctly show.

As the principal controversy turned on whether the defendants were negligent in not making adequate provision

for the safety of the mine, the propriety and adequacy of this timbering became an important subject of inquiry, which embraced, moreover, the purposes it was designed to accomplish. And in this connection it was insisted by defendants that the issue presented by the declaration was too narrow to admit the claims made on the trial.

The declaration sets out at length a description of the mine and the manner of its working and timbering, and the importance of the pillars and supports to hold up the surface and prevent the caving in of the mine. It then describes the scramming or robbing process by taking out the remaining ore and replacing it with timbers insufficient in size, and so carelessly put in as to be inadequate to take the place of the ore and hold up the weight of the surface above. It then describes the giving way of the timbers and fall of the pillar and the subsequent events, and alleges the cause of the intestate's death to be the negligent removal of the rock and ore supports without proper substitution of other sufficient means, and the improper direction of decedent to work on the surface after the giving way of the pillar and timbers.

It is now claimed by defendant that under this declaration it must be confined to a case where the supports that gave way were in contact with the upper rock and directly held it from yielding, and that it yielded on their removal or at least that they were meant to hold up the weight of the pillar itself; and that, as the pillar did not reach to the upper roof of the mine and was partly held up itself by the pressure of the walls, there can be no recovery.

This does not appear to us a reasonable construction. The plaintiff was bound to show that the accident in question was a consequence of the removal of support, and this was the case sought to be made out, and which the jury found was made out. But the declaration does not rest on the narrow ground that the roof exercised an immediate vertical pressure on the pillar and dropped on its withdrawal, or that the timbers were merely to bear up weight. The testimony, which it was for the jury to weigh and apply, tended to show that the pillars were designed to keep the walls apart, and this is

neither more nor less than to support that part of the mine which was liable to fall down or fall over. Nothing situated as this mine was falls in any direction but downward or inward. The plaintiff's witnesses were explicit in saying the purpose was to support the ground under which the mine was worked, and that the weight above was such as to require such or equivalent support. This was the opinion of witnesses whose opinion, if otherwise competent, the jury had a right to consider. And if they were satisfied that the actual caving in of the mine came from its having lost this support, we think there was testimony which tended to prove it.

All of the testimony for plaintiff, and most if not all of that for defendant, certainly is open to the construction that the whole combined work of pillars and timbering was designed to keep the mine firm. There was testimony indicating that it was deemed important to the stability of these pillars of soft ore that they should be in close contact with the timbering. And it is, from the testimony, a not unreasonable assumption, as there is some very direct testimony that it was important that the timbering should be kept firmly in place. Every-day experience shows that a frame which is turned from the perpendicular loses much of its firmness and strength against pressure. And it also is apparent that any such structure as is put up in a mine to stay the walls, and keep the mine from danger on that score, must be adapted to the incidents of mining, involving the falling of ore and rock, and the shock of explosions. It is also matter of common knowledge that the sudden removal of a support or frame-work may cause what is above or about it to give way at once or gradually, when a slower or more cautious removal might have left it standing alone and unshaken.

We think the defendant was fairly notified, and the course of the trial shows that it was not in any way surprised by the claim, that the issue covered the adequacy of the timbering at the place and under the circumstances, and involved a full inquiry into all of them. And we think also, that if the mine gave way at the surface of the ground, and swallowed

up the earth and buildings on it, and if this was the result of removal of the pillar, there can be no propriety in saying the pillar was not a means of supporting that which gave way.

It is claimed, however, that there is no testimony to support the theory that the timber under the pillar did give way, and it is insisted that some of the witnesses could not possibly have seen what they swear they saw. It is enough to say that the witnesses are positive as to what they saw, and the jury had a right to believe them. The testimony of the crumbling of the pillar is in the record, as well as that of the crashing of the timbers, and while no one could very well inspect the bottom of the mine for purposes of the trial, the facts and coincidences are so presented that the court could not have taken them from the jury.

Complaint is also made that the testimony admitted to show the inadequacy of the timbering was insufficient. But upon this there were witnesses on both sides of the case, and their qualifications as experts were of the same character. The witnesses for the plaintiff testified to familiarity with such mining, and that a knowledge of the proper methods of timbering was a necessary part of their mining knowledge and experience. There was no such uniformity of testimony in favor of this particular method as made the defendant's witnesses entitled to credit on that ground above the rest. The case shows that this method was not universal, or even general in that region. It may or may not have been an improvement or a proper method. But this, to a jury of ordinary men, was a question on which they needed instruction from experienced mining men, and having heard both sides, they had a right to form their own conclusions. It is not for a court to overrule it, in such a conflict. We do not think it can be said that the witnesses usurped the functions of the jury.

It is also claimed that there was nothing to authorize a supposition that there was danger of caving in from the surface. There was some evidence that this subject was discussed with Captain Wicks, and that he said he thought the apparent cracking would not go beyond the jasper. There

was further evidence which tended to show that on Monday morning a crack was visible, and noticed by him as well as others, which appeared to them to be in the jasper, and to be dangerous. There was testimony showing very fully that it was deemed dangerous to go down in the mine on Monday, and that the mining captain, Wicks, proposed and determined to abandon some of the tubing and gave orders to have nothing said about it.

Of course it is not for us to draw conclusions. But we do not see any reason why it was not competent for the jury to find that the subsidence of the pillar, and the subsequent dropping of ore and rock, and the conduct of all the parties including the mining captain, indicated both danger and reason for suspecting it.

The suggestion that the negligence was that of fellow-servants is not applicable. In this respect the case is within several of our previous decisions cited on the argument, which hold the employer responsible for the reasonably safe condition of the premises where he sets men to work. Deceased was not a miner, nor bound to know the condition or fully understand the exigencies of the underground works, so far as he was not in contact with them, with means of passing judgment upon them. And it would be going very far to hold that such an accident as this was one of the natural perils of his employment. The question does not appear to us, in the light of our past decisions, to require enlarged discussion.

Some objection was also made to the introduction of the acts and statements of the mining officers during the interval between the accident on Friday and the fatal one on Monday. But these transactions were continous parts of the res gestæ, and were important not only to show knowledge of the condition of affairs, but also to show how far they exhibited care and prudence in matters involving the safety of persons employed.

Upon the question chiefly argued, which was the right of defendant to have the case taken from the jury for want of evidence, we think, for reasons before given, there were facts

on which they were rightly allowed to pass. The same reasons will apply to most of the particular requests, which were either involved in the charges given, or otherwise such that the court could not be required to give them in the shape presented.

It was entirely immaterial whether the mine was in proper order in other respects, if the particular things alleged and relied on were improper and led to the injury complained of. And as already suggested, the jury had their attention called throughout to the particular mischief.

We need not discuss at large the charges asked, which requested the court in substance to take from the jury an inquiry how far James had such knowledge as would put the risk on himself. The charge was carefully framed on this matter, and was in full accordance with our previous rulings. We do not think the jury could have been properly debarred from determining how far he had knowledge, and how far he relied on the action and presumed knowledge of the mining officers. We can find nothing to indicate that the court exceeded its duty in making this reference.

Neither do we think there was anything out of the way in what was said concerning the duty of defendant to employ skilled and experienced agents. It may be true that there may be no negligence in employing a person who is supposed to be competent and is not. But there were no recent changes in the management, and there was nothing to call for any very technical qualifications of the general rule of duty. We think the decedent had a right to act on the assumption that it was safe to do what he was employed to do, unless he had knowledge which should have warned him it was unsafe to do so. This was properly charged.

We do not think that in this suit against persons in no way interested in the estate, there was any need of going beyond the letters of administration to establish plaintiff's right to sue. They were granted by the proper court, and as against strangers, must be presumed properly granted. *Woods v. Monroe* 17 Mich. 238 ; *Cook v. Stevenson* 30 Mich. 242.

Neither do we think the court erred in rejecting the ques-

tion, put to plaintiff on cross-examination, whether James was not, when he married her, married to another woman from whom he had not been divorced. That question—if the inquiry is open—may perhaps be important in the distribution of the estate. But it has been decided by the probate court that plaintiff is entitled to administration, and it is not competent on this issue to inquire into matters which no one could fairly anticipate and which would be no bar to the action. It may also be suggested that there can be no presumption that the witness could answer with knowledge such inquiries. But this case is not the proper occasion for trying the validity of marriage or divorce collaterally. *Waldo v. Waldo* 52 Mich. 94.

While we have not taken up the errors assigned one by one, we have considered all that seem to us material, as presented on the argument. We think no error has been established, and

The judgment must be affirmed.

The other Justices concurred.