KAUKOLA *v.* OLIVER IRON MINING CO.

1. MASTER AND SERVANT—NEGLIGENCE—SAFE PLACE—LIGHTS.
Testimony that an electric light, placed near an aperture in a mine shaft, was not burning after the plaintiff was injured, and that the bulb had been broken, tends, although contradicted, to prove a material question of fact in an action for negligent failure to provide proper illumination.

2. SAME—DUTY TO PROVIDE PROPER LIGHTS.
A question of fact as to the purpose of such light is presented by testimony of superior servants of the defendant that it was provided so that the men might walk with safety, and to protect them.

3. SAME.
The duty to maintain proper lights in a mine so that employés in getting to and from work might avoid a dangerous opening in a level arises from the nondelegable duty of the master to provide a safe place.

4. SAME—ASSUMED RISK—CONSTRUCTIVE KNOWLEDGE.
Under uncontradicted evidence that the servant did not know of a dangerous opening in a dark portion of the mine in which he was employed, that the hole was not much more than a foot in apparent width when seen from certain positions, and was improperly lighted, raises a question of fact for the jury as to his constructive knowledge of the danger.

5. SAME.
The servant would be held to have assumed the risk if the opening was such as would not escape ordinarily careful observation.

6. SAME—SAFE PLACE.
The employer must furnish a suitable place where the servant, with due care, may perform his work without being exposed to any but the ordinary dangers of his occupation.

7. SAME—ASSUMED RISK.
The servant is not bound to familiarize himself with all the machinery and appliances which he does not use himself.
159 MICH.—44.

8. Same—Presumptions.
   The servant has a right to presume that his safety has been
   reasonably provided for, and, in general, may use a walk or
   appliance without first particularly inspecting it.

9. Same—Proximate Cause—Contributory Negligence. ·
   Whether the absence of sufficient light was the proximate
   . cause of the servant's injury, and whether he was guilty of
   contributory negligence, were questions of fact.

Error to Gogebic; Cooper, J. Submitted January 19,
1910. (Docket No. 92.) Decided February 3, 1910.

Case by Eino Kaukola against the Oliver Iron Mining
Company for personal injuries. A judgment for defend-
ant on a verdict directed by the court is reviewed by
plaintiff on writ of error. Reversed.

*P. H. O'Brien* and *George O. Driscoll*, for appellant.

*Charles M. Humphrey* and *R. C. Flannigan*, for ap-
pellee.

Stone, ·J. This is an action on the case brought and
tried in the Gogebic circuit to recover damages for a per-
sonal injury received by the plaintiff about 10 o'clock on
the night of April 4, 1907, while employed by the defend-
ant in the Aurora iron mine at Ironwood, which was op-
erated by the defendant. There was a jury trial, and at
the close of all the evidence, upon the defendant's motion,
the circuit judge directed a verdict for the defendant, and
a judgment followed accordingly. The case is brought
here by the plaintiff upon writ of error.

We have discovered in the record no reversible error in
the introduction of evidence, and shall only consider the
assignments of error relating to the direction of the ver-
dict.

A brief statement of the conditions in the fifteenth level
of the mine, where the injury occurred, and of the employ-
ment of the plaintiff, will be sufficient. The ore vein and
drifts in this mine run easterly and westerly. There were

17 levels, numbered downwards from 1 to 17, inclusive. There were two shafts, known as "A" and "No. 1," which connected with the main or foot drift of the fifteenth level near its westerly end. This foot drift was nearly a mile long, was timbered with sets of eight-foot upright posts and eight-foot caps, and lagging behind, as mine drifts usually are. There were crosscuts leading off from this drift. Car tracks of 25-pound iron rails and 2-foot gauge were laid on cross-ties along the middle of this foot drift, and there were a number of crosscuts with switches at the crosscut entrances. Trolley wires were installed therein above the tracks to furnish power to electric motor cars which were operated thereon. Push cars, used in conveying timber and moved by hand, were also run on these tracks. The motor cars had no certain meeting points, and had the right of way, and the timbermen were required to not interfere with their operation. These motors had gongs and headlights, with reflectors on each end. The motors were used for handling rock and ore, and were each manned with a driver or "motorman" and a helper, called a "swamper." As we understand the record, there were two motors operating in this drift, and each made 25 trips, more or less, per shift to the shafts, hauling trains of three or more cars each trip. There were two switches some distance east of shaft No. 1, called switches 48 and 24, the 48 switch being closest to the shaft. Before February, 1907, the defendant had constructed a raise— called in this record a "chute"— in the foot drift of this mine on the fifteenth level directly under the track and between switch 48 and switch 24, vertically from the floor of the foot drift of said fifteenth level, a distance of 75 feet downward to the sixteenth level of said mine. Said raise was so constructed as to leave an opening in the floor of said drift from 12 to 18 inches wide by 7 feet long on each side of said track, and in such a manner as to leave but one means of passage over and across said raise; that being along and upon said car track between the rails on which a pathway was constructed with plank between

the rails, the rails being two feet apart. There was evidence tending to show that the raise before the track was laid over it, and the space between the rails was covered, was 7 feet by 4 feet—that was the cribbing of the raise. It was claimed by the plaintiff that from the time of the construction of said raise and up to the time he was injured the defendant had customarily and in fact constantly kept and maintained in this foot drift electric lights of 16 candle power at the switches, and one over this raise or chute, which was of material assistance in determining the location of the raise to such persons as had occasion to use this track as a passageway; that between 48 switch and the raise was a water ditch on the southerly side of this two-foot railway track, in which water continually ran and descended with considerable noise to the sixteenth level; that on the north side of the track between 48 switch and the raise was an air pipe along by said raise.

The plaintiff was born in Finland, and was 22 years old in January, 1909. He came to this country in April, 1905. During the first year he was here he worked three months as a section hand repairing railroad, and about eight months in the woods, cutting and skidding timber. He then worked in the East Norrie mine a few days, tramming. After that, and in the first part of May, 1906, he went to work in the Aurora mine, and worked nearly half a year as a timberman and filling cars on the fifteenth level. He knew where the said foot drift was, and was in it while he worked there during 1906. He testified that he did not know at the time where the switches known as 48 and 24 switches were. He knew that there was not any raise leading from the floor of the foot drift to the sixteenth level of the mine between 48 and 24 switches at the time he worked there in 1906. After working at this Aurora mine about half a year, he went back and worked in the East Norrie, and he worked at the last-named mine up to March 19, 1907, as timberman; it being his duty to help the miners bring in the timbers, lagging, etc. On March 19, 1907, he went to

work a second time in the Aurora mine.   Two or three of
his comrades went with him to the Aurora.

He testified:

" Capt. Thomas hired us to work in the Aurora when I
went there last.   *   *   *   I went to work that evening.
After I left the dry house, I walked to the cage shaft,
and went down to the fifteenth level.   We waited for the
boss to give us directions where to go to work.   Several of
us belonging to the same timber gang were to work to-
gether.   Those were the men that came in with me from
the East Norrie.   *   *   *   We followed the man and
started to walk east in the drift, the main drift, the foot
drift.   We walked east in the foot drift, quite a long dis-
tance.   I thought it was almost a mile.   I walked with
the boss, right behind him.   We walked through the drift,
and presume passed the chute, into which I afterwards
fell.   The boss did not call my attention to the chute, or
tell me it was there, or anything.   While we were walk-
ing through the drift, I was walking as near to Mr.
Caddy as one man can walk behind each other.   He put
me at work timbering.   I could speak just a few words,
poorly, of English at that time.   The nature of my duties
was to bring the timber and lagging and cribbing to the
miners.   The boss and the miners told me where to get
them.   There were four men working in my crew.   They
were all Finns."

The plaintiff, referring to the circumstances of the in-
jury, testified:

" I was working in the Aurora mine on the 4th day of
April, 1907, at those same duties, night shift.   I went to
work that day at the usual time, just a little before 7.
All of the members of my crew were not present that
night.   There were three present.   We did what the boss
told us.   He told us to bring timber near the fourteenth
level.   We were working on the fourteenth level at that
time.   After he told us, he took one man away from our
gang.   I told him it was rather hard work for two men to
do.   I didn't know that boss' name any better than I used
to call him ' Jack.'   That just left my partner and me in
the crew.   The timbers that were used up in that part of
the mine were gotten near the 'A' shaft, or cage shaft, on
the fifteenth level, and to take them up on the fourteenth
level we had to take them up on a truck to the place where

they were hoisted up on the fourteenth level through the foot drift on the fifteenth level. According to my estimation, we had to take them east through the foot drift nearly one-half a mile. We had to take them very much east of the place where I fell in the chute. When the boss told me to go out and get this timber, my partner, Oscar Maki, and I went. * * * We were there on a sublevel between the fourteenth and fifteenth levels. After we started after the timbers, I saw another boss, Mr. Caddy, at the following switch after 48 switch. * * * I tried to explain to him that there were only two of us that were ordered to bring and set the timbers in. He said that we had better try to do it. He didn't say anything else to us at that time. He just told us to go ahead and get them. He didn't say anything about the chute. He didn't say anything about the light over there. After we talked to him, we commenced to walk towards the shaft, and we walked near to No. 1 shaft, where we took the truck. We didn't have the truck till we got to No. 1 shaft. We then went to 'A' shaft. Then we commenced to pick up such timber as we thought necessary out there, and then we put it on the truck, and commenced to go towards the place where they were needed—that was east. We met Mr. Caddy by No. 1 shaft, and asked him what chance he had to go in. We asked him that because we couldn't always go in on account of motors being inside. They were working there —going in and out—and we had to keep out of the way of the motors. He told us to wait a minute until the motor came out, and then go in."

He then described the manner of their waiting for the motors to pass, going upon the side track, etc., and continued:

"We had timbers called drift timber loaded on that car, about 7 feet long, and a foot or more thick. I can't remember whether they were green or dry timbers. We had three timbers on the car. The car was about three feet wide anyway, and our load of timber was anyway over three feet wide. The car had four wheels, and that time it was very hard to push, it was very heavy. We were pushing the car with our hands and putting our shoulders to it, propelled it along. My partner was walking on the right side of me in the bottom of the drift. After we left 48 switch, he walked inside the track, between the rails,

and I walked outside of the rail on the left side. That would be on the north side, I think. I didn't walk between the rails, too, because there was no room for two; that is, side by side for two. We had both candle lights with us at that time, which we kept in the rear of the car on the timber. We had a candlestick made of iron that we stick into the timber. We put it on the rear end of the timber so that it would not blow out, and, if they went out, we could easily light them again. I don't think they would stay lighted on the front end of the timber, because there was a good deal of draught. It would easily blow out the light. After we started east from 48 switch with our car of timber at that time we pushed the car very hard, we were in a hurry to get out of the way of the motor because we heard the bell ring, and I cannot describe exactly the minutes, but all at once I fell down. I did not know myself where I fell. I thought I fell very far, but I did not know how far I fell down. I did not lose my senses when I fell. I cannot describe to the jury how I fell better than that I fell down and went to the bottom of the hole. I fell with my feet down. I was trying to hold myself this way as I went down—spreading out my arms. Then I fell down in a sitting position. I will illustrate to the jury just how we were pushing the car at the time I fell. I had my leg in this position (indicating), and my shoulders I had towards the timber, and I was pushing the car in this way (indicating). I was braced against the timber with my feet back from under it, my feet braced."

He then described the nature and extent of his injury.

On cross-examination the plaintiff testified that he did not know the hole into which he fell the night he was injured was there before the time he fell into it; that he had never been told by any one that there was such a place in the foot drift in the fifteenth level. We gather from his testimony that he does not claim to know whether or not there was a light over the raise at the time he fell into it. But he testified that there was none there when he was brought up after the injury. He further states that he made about three trips a day over this raise; that, when he went to the fourteenth level of the mine, he went down "A" shaft to the fifteenth level, and from there he walked

east through the foot drift, and then up the ladder to the sublevel of the fourteenth, and each time passed the place where he fell in, and repeated the same when he came back.

The evidence upon the trial was conflicting as to whether or not there was an electric light at the raise at the time of the plaintiff's injury, and we think it a material question as to whether the light was burning at the raise at the time the plaintiff fell into it. The witness Victor Maki testified that he was at work on this night at this place; that he and two other men dumped rock in the raise in question the night plaintiff was hurt, on two occasions, about 8 or 9 o'clock, and that he went by the raise that night after plaintiff was hurt, and that he did not see any light over the raise up to midnight. He claims that he is sure of that because there was a good deal of talk about it. He is positive that there was no light there when he dumped the car before plaintiff was hurt, and claims that he noticed it was gone when he dumped the first car. He further testified that there had been a light kept there previous to that night on that chute or raise.

There was also evidence showing that this light had been broken in the afternoon, about 2 or 3 o'clock, and a witness testified that he saw the bulb broken, and described the manner of it. Robert Lindberg also testified that there was no light over the raise that night. He claims that he learned there was no light there a little after 7 o'clock in the evening. He further testified that he saw the socket without the light, and the reason that he missed it was because he could not find the tally board that was used to mark the number of cars that were emptied. He further testified that he spoke to Mr. Caddy about the light being gone that evening at about half past 7, and details the conversation. This is denied by Mr. Caddy, and it is the claim of the defendant that there was an electric light burning at the raise all that night, and at all times, and a number of witnesses so testified.

1. In our opinion this testimony raised a question of fact for the jury.

In *McDonald* v. *Railway Co.*, 105 Mich. 659 (63 N. W. 966), the question was whether certain bars were up at 4 o'clock. One Brearly testified that they were. Justice MONTGOMERY, speaking for the court, said, after reciting the testimony:

" I think it very clear that this testimony raised a question of fact for the jury. It is true that the defendant's witness testified that the bars were up at 4 o'clock on the 7th, but there is no testimony that there was anybody whose duty it was to put them up after 1 o'clock on the 7th, when the witness England testifies they were down. This testimony clearly tended to impeach the recollection or veracity of the witness Brearly. According to his testimony, the bars could not have been down except on very rare occasions, whereas the other witnesses testified that the bars were left down constantly. * * * In my judgment it was for the jury to say whether his positive testimony that they were up on the 7th should be accepted in view of the fact that his testimony upon this question of their being up at other times during the summer was so directly disputed by the testimony of other witnesses."

2. Were the lights kept at the switches and at this raise for the benefit of the employés of the mine, and to enhance their safety? In the argument at the hearing, defendant's counsel took the position that these lights were not intended for the security of the workmen. There was testimony upon that subject as follows: Andrew Vronch, one of defendant's witnesses, among other things, testified:

" I had nothing to do with putting the lights in. That was the business of the electricians. It was their business to put back a light if it was out. If a light went out on the night shift, a lamp burned out, they have to get some lights extra. Then the captain—the foreman—or the motorman put them in. * * * If the motorman put a lamp over the chute or any place, he would be just doing that of his own free will. The only ones whose business it was to do it was the electricians. It was their business

to see that lamps were kept burning, and on the night shift it was the business of the boss and the motorman. They kept the lamps burning there to show the men how to walk in the raise, in through, was the reason they kept them there to make it good and safe to walk along.

"*Q.* Because if there was no lamp there a man might walk into a hole, is that true?

"*A.* Why, sure; he might walk in a hole. A fellow could see from one light, or might see from one light to another."

This man had testified on direct examination that the light was kept at the raise to show the men where to walk. Hart Caddy, the shift boss of defendant, testified, on cross-examination, as follows:

"*Q.* And you just testified that there was a light there that night because that was your general habit, and you depend upon that?

"*A.* Well, it is my general habit, and, if there was a light out in passing through, we certainly would notice it. I always notice that, because that was part of my business. I had to look out for the lights and raises, switches, and such things, and I was the only man on the fifteenth level at that time whose duty it was to do that—to look after the lights. And that is why I am so positive about the fact that the light was there.

"*Q.* Did defendant impose that duty of keeping the lights there for protection of the men upon you?

"*A.* Well, that is the electrician's through the day, the same as I said before. On the night turn, we look out for them at such places as switches and raises where they are most necessary. I see that they are there. The company expects me to do that for the safety of the men. They expect us to see that we carry that out. That is a part of my duty as shift boss. * * * It is my duty to look after the lights on the fifteenth level. I was the only one that that was imposed upon. I looked after the lights and the motormen, and was the only one on the fifteenth level. Well, there are five of us, but I was on the fifteenth level; yes, sir. I was the only boss on the level, and the only one that was appointed to look after the lights for the safety of the men. Yes, sir; for the safety of the men."

We are of the opinion that this evidence tended to show that the light had been placed and kept at the raise by

the defendant for the safety and security of the workmen. At least, that question became one of fact for the jury, under the evidence. The raise was a dangerous place.

3. If this was the duty of the defendant, does the doctrine of fellow-servant apply, and can it be said that the matter of the failure to keep the raise lighted was simply the neglect of Caddy, the shift boss, who was the fellow-servant of the plaintiff? The lighting of this passageway or thoroughfare of the mine, far distant from the working places of most of those who passed through them—it being always dark in the mine—was just as necessary for the safety of the men, as it was to have the walls and floors in a proper condition. It was one of the "instrumentalities" which it was necessary to provide to enable the men to do their work, and to get to and from their work safely. It was a thing which it was necessary to keep permanently in condition. Unlike the case of *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236 (109 N. W. 431), here the place furnished was a permanent place of work, and not one where the conditions were constantly changing. Here, in our opinion, the rule of a safe place to be furnished by the master applies. In *Cristanelli* v. *Mining Co.*, 154 Mich. 423 (117 N. W. 910), it was held that the engineer of a mining hoist, in so far as it is his duty to keep the place safe, is not the fellow-servant of an employé engaged in loading machinery upon the skip at the collar of the shaft. In *Beesley* v. *F. W. Wheeler & Co.*, 103 Mich. 211 (61 N. W. 662, 27 L. R. A. 266), Justice MONTGOMERY, in a concurring opinion, said:

"The rule that it is the duty of the master to furnish a safe place for the servant to work is so universal, and so thoroughly settled, that no citation of authorities is necessary to sustain it. It is also settled in this State that this duty is one which cannot be delegated by the master so that the employé engaged to do the work of making the premises safe is to be treated as a fellow-servant of those who are employed and engaged in the general work for which the premises are intended"—citing *Van Dusen* v. *Letellier*, 78 Mich. 492 (44 N. W. 572); *Brown* v. *Gil-*

*christ*, 80 Mich. 56 (45 N. W. 82, 20 Am. St. Rep. 496); *Roux* v. *Lumber Co.*, 94 Mich. 607 (54 N. W. 492); *Morton* v. *Railroad Co.*, 81 Mich. 423 (46 N. W. 111).

See, also, *Sadowski* v. *Car Co.*, 84 Mich. 100 (47 N. W. 598); *Town* v. *Railroad Co.*, 84 Mich. 214 (47 N. W. 665); *Fox* v. *Iron Co.*, 89 Mich. 387 (50 N. W. 872); *James* v. *Mining Co.*, 55 Mich. 335 (21 N. W. 361).

The rule is well stated in Baldwin on Personal Injuries (2d Ed.), §§ 386, 388, as follows:

" The master must provide his servant with a safe place in which to work, and furnish him with suitable machinery and appliances with which to perform such work, and it is his duty to keep such machinery and appliances in good repair. If he cannot do this himself personally, he must provide some other person to take his place in this respect; and the person to whom the master's duty is thus delegated—no matter what his rank or grade, no matter by what name he may be designated—cannot be a servant in the sense or under the rule applicable to injuries caused by fellow-servants. Such a person is an agent, and the rules of law applicable to principal and agent must apply. He is generally called in the law a vice-principal. In order to keep the machinery and appliances safely in repair, the law makes it the duty of the master to make all needed inspections and examinations; and he cannot escape responsibility by delegating this duty to one who in other respects may be a fellow-servant of the person injured by the failure to properly perform his duty. * * *

" The weight of authority holds that the duty of inspection cannot be delegated, or the responsibility therefor shifted from the master, and that whenever the duty of inspection is placed upon a servant, whatever may be his grade or rank, he is to that extent a representative of the master, though in all other respects he may be a fellow-servant."

In *Anderson* v. *Railroad Co.*, 107 Mich. 592 (65 N. W. 585), and in *Balhoff* v. *Railroad Co.*, 106 Mich. 607 (65 N. W. 592), it is held that sectionmen, in so far as they have the duty of keeping the track in repair, are not fellow-servants of the trainmen.

In *Knapp* v. *Railway Co.*, 114 Mich. 199 (72 N. W.

200), and in *Fluhrer* v. *Railway Co.*, 121 Mich. 213 (80 N. W. 23), where brakemen received injuries from holes in a defective track bed, the same holding was made.

In *McDonald* v. *Railroad Co.*, 108 Mich. 8 (65 N. W. 597), where a brakeman was injured by a defective coupling on an engine, it was held that the engineer whose duty it was to inspect the couplings, etc., on his engine, was not in that respect a fellow-servant of the brakeman.

In *Thomas* v. *Railroad Co.*, 114 Mich. 59 (72 N. W. 40), where a section foreman in selecting a rope for the use of his men was held not in that respect a fellow-servant with them; but was a fellow-servant in so far as using the rope was concerned.

In *McDonald* v. *Railroad Co.*, 132 Mich. 372 (93 N. W. 1041, 102 Am. St. Rep. 426), it is held that the car repairer, whose duty it is to inspect the cars, is not in that respect a fellow-servant of a conductor. This brings us to the general question of assumption of the risk.

4. Did the plaintiff assume the risk? The doctrine of assumed risks of servants applies, and is limited in application, to dangers which the employé either knew or should have known. The evidence in this case may be said to be undisputed that the plaintiff did not know, as a matter of fact, of the existence of the raise. Therefore, upon this branch of the case, the only question is whether, as a matter of law, it can be said that he should have known. The learned circuit judge charged the jury as follows:

" Now, it seems to me that this case falls clearly within the cases that, where a dangerous place is apparent and obvious, the servant is bound in law to observe it. He has had an opportunity of doing so, and certainly a man, as the plaintiff did in this case, passing this chute or raise as many times as he did, could not help but have the opportunity of seeing it. I am forced to that conclusion the more that I have looked over the authorities. It seems to me that it falls absolutely within the cases that hold that a servant assumes all of those risks that are apparent to him if he has an opportunity to observe them for

himself.   In this case the plaintiff certainly had such an opportunity."

An inspection of the record will show that there was a conflict in the evidence as to the appearance of the hole or raise.   It is the claim of the defendant that it was open and obvious to any passerby.   But taking into consideration the surroundings, and that there is some testimony which does not make the opening upon the north side wider than one foot when looking down upon it, and that the timber underneath had been cut off slantingly to enlarge the entrance horizontally, it may well be doubted whether this hole was so apparent, and apparently dangerous, as is claimed by defendant.   In order for the defendant's contention to prevail upon this point, it should appear that this hole was so apparent that it must have been obvious to a person of ordinary prudence and care in the employé's situation.   That is, it must be such a defect or hole as would not escape ordinarily careful observation. *Lamotte* v. *Boyce*, 105 Mich. 545, 548 (63 N. W. 517); *Bauer* v. *Foundry Co.*, 132 Mich. 537 (94 N. W. 9):

"Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk." *Narramore* v. *Railway Co.*, 96 Fed. 301, 37 C. C. A. 501.

The employer must furnish a suitable place where the servant, with due care, may perform his work without being exposed to any but the ordinary danger of his occupation; and the servant will not be bound to familiarize himself with all the machinery or appliances which he does not use himself.   The servant has a right to presume that his safety has been reasonably provided for, and in general may use a walk or appliance without first particularly inspecting it.   See *Clark* v. *Cement Co.*, 138 Mich. 673 (101 N. W. 845), where the loose plank in the walk threw decedent into the machinery.   Also *Nichols* v. *Railroad Co.*, 145 Mich. 643 (108 N. W. 1016), where it

was held that defects in a 35-foot ladder on the side of a tank, only occasionally used, need not be discovered by a workman who uses it, even though ordinary care and inspection discloses them; and it was claimed that it presented a question for the jury.

It was said in *Boman* v. *Iron Co.*, 147 Mich. 178 (110 N. W. 518):

"A person who is employed and instructed to commence work at a particular place is under no obligation, in order to protect himself from a charge of contributory negligence, to first go over a building or plant and make himself familiar with each piece of machinery, and the danger he may incur in coming in contact with it."

And the same rule would apply with reference to the assumption of risk. As was said by Justice BLAIR in *De Kallands* v. *Telephone Co.*, 153 Mich. 25 (116 N. W. 564):

"When there is a possible phase of the case where the risk is not assumed, the trial judge cannot properly direct the verdict on the ground that such risk was assumed."

In our opinion the circuit judge should have left to the jury the question as to whether the risk resulting from the presence of this raise was open and apparent, and was assumed by the plaintiff. We think the question was for the jury under proper instruction, and that the court erred in directing a verdict for the defendant. The questions of contributory negligence, and whether the absence of the light was the proximate cause of the injury, should also have been submitted to the jury.

For the errors pointed out, the judgment below must be reversed, and a new trial granted.

MONTGOMERY, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.