### STREPANSKI v. GRAND RAPIDS PLASTER CO.

MASTER AND SERVANT—SAFE PLACE—INSUFFICIENT LIGHTS.

> The duty of the master to provide a safe place does not apply to work in a mine where conditions constantly change by reason of blasting and removing rock, so as to require the master to maintain sufficient lights for temporary contingencies.

Error to Kent; Perkins, J.   Submitted June 28, 1910. (Docket No. 125.)   Decided September 27, 1910.

Case by Andrew Strepanski against the Grand Rapids Plaster Company for personal injuries.   A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error.   Affirmed.

*Thomas P. Bradfield (Francis A. Stace, of counsel),* for appellant.

*Kleinhans & Knappen,* for appellee.

Moore, J.  The defendant is engaged in the business of mining gypsum and preparing and placing its various products upon the market.  The plaintiff has been at work in the mine more than 25 years.  At the time he was injured he had been a breaker for more than six months.  While breaking and loading gypsum into a car, a piece broke off from a large rock and fell upon his leg and ankle, injuring them very severely.  It is his claim that the defendant was negligent in not having the place where plaintiff was at work properly lighted so he could have seen the crack in the rock, and thus have avoided the accident.  At the conclusion of the evidence on the part of the plaintiff, the circuit judge directed a verdict for the defendant.  The case is brought here by writ of error.

It is insisted upon the part of the plaintiff that the doctrine of a safe place to work applies to this case, and that the case should have been submitted to the jury.  We quote from the brief of counsel:

"The case of *Fox* v. *Iron Co.*, 89 Mich. 387 (50 N. W. 872), is important in this case in two ways.  The court says:

" ' The practice of requesting the court to direct a verdict at the close of the plaintiff's case is not one to be commended, as the circuit court would rarely, and never, except in a very plain case which was free from all doubt, grant such motion.  *  *  *  The motion should not be granted where there are any inferences of fact to be drawn by a jury from the testimony, and the motion was properly overruled in this case.'

"This case is also important, because it lays down the principle upon which we also rely that an employer cannot delegate a duty, so as to escape responsibility, which properly belongs to the employer, and on page 393 of this case this duty is discussed in the following language:

" ' "The true rule, I apprehend, is to hold the corporation liable, for negligence or want of proper care, in respect to such acts and duties as it is required to perform and discharge as master or principal, without regard to the rank or title of the agent, intrusted with their performance.  As to such acts, the agent occupies the place of the corporation, and the latter  *  *  *  is liable for the

manner in which they are performed." ' *Flike* v. *Railroad Co.*, 53 N. Y. 549.

" 'And hence a true test is—

" ' "Whether the person whose status is in question is charged with the performance of a duty which properly belongs to the master." McKinney on Fellow Servants, p. 54.

" 'Applying this test to the facts of this case, there can be no doubt that Marshall was charged with the duty of keeping the hoisting apparatus in repair, and that such duty properly belonged to the corporation to perform. He was not, therefore, merely a fellow-servant with plaintiff.' "

Many other cases are cited, and particularly the case of *Kaukola* v. *Mining Co.*, 159 Mich. 689 (124 N. W. 591), which counsel says is conclusive of this case.

As bearing upon the question of whether the case should have been submitted to the jury, counsel regard the following testimony as important. We again quote from the brief :

"And the witness Veecncki testifies that from his knowledge of the thickness of this rock that fell and the strength of gypsum rock and the location of the rock on the ground and piled near the big rock that he would say that it must have been cracked at the point it finally broke off before it fell. The testimony shows that plaintiff examined the rock as well as he could in the light furnished, and that it appeared solid before he started to clean up close to it, and that no crack was visible where it afterwards broke.

"The testimony of the plaintiff is that all the cracks in dry gypsum rock like the rock in question which are made by dynamite blasting are visible in a good light, because the force of the gas and the explosion separates the portions of the rock and forces small particles into the cracks in such a manner that the rock does not settle together again so closely but what the cracks can be seen in a good light. Plaintiff further says :

" ' When the lights were near we could see the cracks in the stone, but one could not see them that night, because the lights were far away.' "

It is the contention of defendant that the doctrine of a safe place to work does not apply at all, for the reason

that the work which plaintiff was doing was that of mining, and that the work itself made the place, which was continually changing.

The case made by the plaintiff is, in substance, as follows: There is a main passageway in the mine upon which there is a tram railway for the cars, and in which the main electric wires are placed. From each side of the main passageway rooms or benches are at right angles to the main passageway. The ceiling is supported by leaving pillars of the original gypsum rock. As the lateral benches, or passageways at right angles to the main passageway progress away from the main track, branch car tracks are laid in the side benches or passageways, connecting with the main track. The lateral benches, or passageways, are lighted by electric lights attached to cables. The cables are attached to the feed wires in the main passageway by plugs, and are extended along the ceiling of the lateral passageways, or benches, as the work progresses. These cables are about 50 feet long, and are attached to the ceiling of the side passageways by drilling a hole in the ceiling and driving a wooden plug into this hole. Hooks are screwed into these wooden plugs, and the cables are supported by these hooks. The most advanced portion of the work is lighted by two or three incandescent lamps fastended to a small board, on the back of which is a hook or ring which loops over the hook in the ceiling. The board containing the incandescent bulbs is so arranged that it can be unhooked and carried back and placed behind a pillar during a blast and later hung back upon the hook. At the time plaintiff was injured the side passage on which he was working had been extended about 60 feet from the main passageway. It is the duty of the drillers to bore the holes for the powder or dynamite. After the drillers, come the blasters, who load the holes and fire the blasts during the intermission between shifts, either in the morning or evening. After the blasters come the breakers, who with the aid of a point (which they use as a wedge), and a

hammer, break up the larger pieces into small pieces suitable for the crushers, and load them on the tram cars.

Plaintiff testified, in part, as follows:

"*Q.* Will you tell what the usual practice was in the mine about the blasters working on a bench one night and the loaders coming the next night to clean up after them?

"*A.* When we came to work the blasting had already been done, some drilling was done, and sometimes the loaders and drillers were working on the same bench at the same time. The blasting was always done after one shift had gone away and before the other came. This loading and blasting was done by a loader man. This loader man fired the blasts. * * * The Friday night on which I was hurt was the first night that we had been at work on this bench after the last blast had been fired off, and no rock from the last blast had been taken out before our crew went to work to break rock the night I was hurt. It was smoky in the room when we went to work that night. They had electric lights, but they were dusty and gave poor light, and with respect to the rock part on which we were going to work the light was quite a bit behind it. I don't know how many feet; I could not see well to do my work with the lights where they were. That night I complained about the poor lights. In the first place, I spoke to the foreman, and the foreman told me to speak to Fronczak. This was when we were about to start to work. The foreman's name is Hoffman. He walked around the benches. * * * I told Hoffman right away after I went to work about the lights, the night on which I was hurt, and I told him the light was too far away and that it was not right. Hoffman said he would send Fronczak down. After that I went to work. I saw Fronczak after that about 7 o'clock, and told him to fix the lights, and he said he didn't have time; he had to fix the track. Fronczak said he would fix the lights when he finished the other work.

Two cars had been loaded and been sent away and one more loaded that night before I was hurt. The loaded car was in the middle of the bench at the time. It was about eight feet away from the pile of rock. The top of the pile of rock on the loaded car was about two feet higher than my head, and the light was behind this loaded car. The lights in the mine were put up in the center of the bench, hanging from the ceiling, and there were three globes, not very

large globes, about the size of the one on the table. * * *
After a car was loaded, and before breaking more stone,
we were instructed to see whether the rocks were solid,
and then we had to throw back the dirt, or finer stuff, so
that we would have the floor of the bench clear and clean.
We had to throw it against the wall on the right-hand
side. Every time we would load up a car there would be
a lot of dirt left, and we had to throw that away first be-
fore loading another car. At the time I was hurt I was
throwing dirt away with a short-handled shovel. Before
I started to shovel away this dirt from in front of this
rock, we looked to see whether the stone or the rock was
solid. I could not see any cracks in the rock where it
afterwards broke. The light was dirty and it was far
away. I couldn't see. * * * The loader, Wiktorow-
ski, blasted out this short hole in this large rock. After
he had fired the hole, he said it was all ready. The shape
of the large rock, part of which afterwards fell upon me,
was in the shape of the clay model. I was in front of the
rock on the right-hand side. I can't remember very well
what happened. When I was hurt I was taken away.
I imagine that the piece fell off the top here and slipped
onto me when I was throwing dirt. The top of this rock
which fell as I stood was about four feet above my head
and was about five feet above the level of the place where
I was standing. The middle plane of the rock was about
four feet from the ground upon which I was standing.
* * * When we looked at the rock to see if it was safe
before we shoveled up the dirt, we did not see any crack
in the rock where it afterwards broke; we thought it was
solid all over. When the rock struck me it scratched me
and scraped me and cut two of my veins or blood vessels.
The doctor says I had a broken rib, the flesh was scraped
off of my injured leg clear to the bone, and the rock cut
off the ankle bone."

We have already quoted the rest of his testimony which
is important, and also the important part of the testimony
of Mr. Veecncki. This testimony makes it very clear that
plaintiff was engaged in the work of actual mining, follow-
ing up the work of the drillers and blasters by removing
the result of their work, namely, the dirt and the rock
which was broken down by the blast.

In the case of *Kaukola* v. *Mining Co.*, 159 Mich. 689

(124 N. W. 591), which counsel for appellant regard as conclusive, Justice STONE said, among other things, the following:

" The lighting of this passageway or thoroughfare of the mine far distant from the working places of most of those who passed through them—it being always dark in the mine—was just as necessary for the safety of the men as it was to have the walls and floors in a proper condition. * * * It was a thing which it was necessary to keep permanently in condition."

Mr. Justice STONE then expressly recognizes the distinction between conditions that are permanent and those that are constantly shifting, in the following language:

" Unlike the case of *Livingstone* v. *Plate Glass Co.,* 146 Mich. 236 (109 N. W. 431), here the place furnished was a permanent place of work, and not one where the conditions were constantly changing."

So far as this case is applicable to the one we are considering, it sustains the contention of defendant.

There are numerous decisions of this court upon the proposition that under similar circumstances to the case before us, the doctrine of safe place to work does not apply. See *Beesley* v. *F. W. Wheeler & Co.,* 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266); *Petaja* v. *Mining Co.,* 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505); *Landowski* v. *Chapoton,* 137 Mich. 429 (100 N. W. 564); *Livingstone* v. *Plate Glass Co., supra; Karppinen* v. *Mining Co.,* 154 Mich. 528 (118 N. W. 1118).

It is not necessary to discuss the other contentions of counsel. We think a verdict was properly directed.

Judgment is affirmed.

BIRD, C. J., and OSTRANDER, BROOKE, and BLAIR, JJ., concurred.