PANELA *v.* CASTILE MINING CO.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
    In passing on the correctness of the trial court's action in directing a verdict for defendant, the evidence presented by plaintiff must be considered in the light most favorable to him.

2. MASTER AND SERVANT—MINES AND MINING—DEFECTIVE SIGNALING APPARATUS—NEGLIGENCE.
    Testimony tending to show that the electric signaling apparatus and bell used in connection with the hoist in defendant's mine were defective and the bell gave unreliable or uncertain signals, that, when plaintiff's fellow-servant attempted to signal the operator to draw the miners up out of danger of a blast that they had lighted, the bell did not register the signal which should have been transmitted, and that no one but the hoisting engineer who knew nothing about such apparatus inspected it, and then only when something went wrong, that the miner who gave the signal attempted to give the correct one, but the bell did not sound the proper number of strokes, presented a question of fact relative to the defective condition of the apparatus.

3. SAME—EVIDENCE.
    *Held,* also, that there was evidence tending to prove that defendant was negligent in failing to maintain its hoisting apparatus in suitable condition to perform the service of removing employees promptly from the vicinity of an explosion or blast.

4. SAME.
    And *held,* that plaintiff's evidence tended to establish his claim that defendant had failed to warn plaintiff of latent danger arising from dynamite which had been left near the place of work by another crew.

Error to Gogebic; Cooper, J.   Submitted January 23, 1913.   (Docket No. 63.)   Decided December 20, 1913.

Case by Jacob Panela against the Castile Mining Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed.

*O'Brien & Le Gendre* and *George O. Driscoll,* for appellant.

*Belmont Waples* and *William F. Shea,* for appellee.

McAlvay, J. Plaintiff brought suit for damages for personal injuries received while he was employed by defendant company as a miner in the Eureka mine, operated by it. The result of the trial was a verdict instructed by the court at the close of plaintiff's case in favor of the defendant, upon which a judgment was entered. Plaintiff seeks a reversal of this judgment upon the ground that the trial court was in error in directing a verdict against him.

The case has already been before this court, brought here by defendant to review an order overruling a demurrer to the first count of plaintiff's declaration, when this court affirmed the judgment sustaining the declaration. *Panela* v. *Mining Co.,* 165 Mich. 329 (130 N. W. 686). An examination of the opinion of the court rendered at that time will be helpful in the consideration of the instant case.

The facts in the case cannot be stated briefly in order to give the information necessary to its proper consideration, and for that reason the statement of facts presented by the appellant is adopted. This statement is accepted by the appellee for the most part as correct. Reference will be made to its objections later in this opinion.

"Statement of Facts.

"On and before September 17, 1909, defendant was operating the Eureka mine, working the seventh and other levels, and extending No. 3 shaft, which was a steeply inclined 3-compartment shaft, 12x9 feet in

size, over 1,200 feet deep, and braced with metal
sets to a point about 5 feet below the twelfth level and
14 feet above the bottom. There were 12 levels, about
100 feet apart, numbered 1 to 12 from surface down-
ward. The twelfth level was about 10 feet high and
20 feet long. In the west compartment of the shaft,
between surface and the seventh level, was a skipway
upon which was operated a skip by means of an en-
gine, drum, and cable, in response to signals trans-
mitted by a separate signaling apparatus from that
hereinafter mentioned.

"Three crews of miners, each consisting of 5 men
and a foreman, and who worked 8-hour shifts, com-
mencing at 7 a. m., 3 p. m., and 11 p. m. each day,
were engaged in extending the shaft under a contract
with defendant by which they were paid $25 per foot
for sinking, and were required to use dynamite, and
defendant was to furnish the necessary tools and
materials to do the work and convey the miners to and
from the bottom of the shaft, and provide them with
signaling apparatus, to give signals to be hoisted by
the hoisting apparatus. These men relied upon de-
fendant to promptly and safely hoist them by means
of the truck and bucket hereinafter mentioned when
they signaled from below to move the truck and
bucket, especially when explosions were about to take
place, and expected that the signaling apparatus
would be in such shape that the signal would be
promptly and properly transmitted by it, and the
hoisting apparatus would be in such shape that it
could be promptly operated. They had no voice in
the selection of a foreman or the fixing of his wages,
and, when one of them quit or was discharged, de-
fendant hired another without consulting the miners.
Defendant figured out what each man had coming and
paid him at its office.

"The outgoing and incoming crews generally met
at the seventh level. The twelfth level was an unsafe
place to stay while blasting was going on. None of
the members of the several crews would know what
had been done in the bottom of the shaft by any other
crew unless specially warned by some one else of it.
Dynamite might be scattered around there, owing to
missed holes or its being left there by other crews,
and, in either case, would be dangerous to everybody

in the shaft and easily concealed by the dirt so as to be difficult to discover. Those who load and fire the blasts can tell, by varying the lengths of the fuses and counting the holes that are loaded and lighted and that go off, whether or not there are any missed holes, and, if so, how many, or at least can tell if less go off than are loaded and lighted. The men went to the seventh level when a blast was set off to count the shots as they went off. The foreman was supposed to keep track of the shots and tell the foreman of the next shift if there were any missed holes. The dirt would be pressed and tamped into the holes, and the holes concealed by the workmen. The workmen were not supposed to be always on the lookout for missed holes. Sometimes there would be none for a couple of weeks or longer, and again they would occur once a week. If a workman is notified that there is one, he is on the lookout for it and can better protect himself from any powder which may be scattered around the shaft. Any missed holes or holes which blasted without breaking were reloaded and blasted. The miners expected defendant to keep track of the powder and missed holes that were left in there by the different shifts and to warn the members of each crew of any left in there by any crew other than their own, and, by doing this, the danger to the miners would be reduced. It was necessary for their safety and protection that they should be so warned. The duty of so warning them was imposed by defendant on the foreman of each crew. It was customary to so give such warning where there were several crews working at the same place. The foreman got more pay than the others. He and the captain planned the work, and he looked after everything, gave orders how to do the work, and, if anything was needed, got it for the men.

"In the middle compartment of the shaft was a track, upon which was operated a truck (6 feet long, with a frame and pulley) and the bucket (2½ feet in diameter and height), by means of a puffer engine, drum, and cable. The puffer and drum were in the same building in which the skip engine was; there being only a partition between the two engines. This building was 115 feet from the shaft house. The cable ran from the drum to a sheave in the frame of the truck and to the bail of the bucket. A pole placed

across the shaft at the last set prevented the truck from going farther down than that. By this arrangement, the bucket was kept upright, and, when the truck stopped, the bucket would continue to the bottom and then, when it would rise, the bail would catch onto the truck and both would go up together.

"There was a ladderway in the shaft above the top of the twelfth level, but below the seventh level it was in a poor, broken condition, especially near the bottom. A person who climbed through the shaft would have to climb part of the way on the sets, and that was dangerous. There was but one way provided for men to get into and out of the bottom of the shaft, and that was by means of the truck and bucket. The only ladder down there was a poor, short one, which only reached to where the truck stopped.

"The signaling apparatus used in connection with the truck and bucket consisted of an electric bell having an 8-inch gong, which was worked with a magnet, was operated by dry cell batteries, and was attached to the wall of the engine house near the puffer, where there was considerable vibration. Two separately insulated wires ran from it down through the shaft and were attached to the shaft down to a point about 40 feet from the bottom. They were loose from there down. About 3 inches of the insulation was removed from the bottom end of each of the wires. The bell was supposed to ring in the engine house each time the two bare ends of the wires were touched or rubbed together; a long bell was given by holding them together. At blasting times the wires were rolled and carried up the shaft 30 or 40 feet and signals were given from there, and the wires left there to prevent their injury by the blasts. The miners had no opportunity to see the apparatus in the engine house.

"The dirt was loosened in the shaft by drilling holes 7 or 8 feet deep and $2\frac{3}{4}$ inches in diameter, with air drills, loading them with dynamite, and blasting them by means of caps and fuse. The dirt was hoisted to the seventh level. Each crew worked in sets of two. One set worked in the middle and one in each end of the shaft. Each set was supposed to attend to their own sections and pay no attention to the sec-

177 MICH.—43.

tions of the others. Defendant kept its dynamite, fuse, and caps on the surface. A missed hole is where there has been dynamite loaded in the hole which did not explode. An exploder is a stick of dynamite with fuse and cap attached to it. The fuses were cut about 12 feet long and would burn about one foot a minute. Fuses do not readily take fire, and for that reason the ends are split to expose the train of powder inside. If fire was set to the side of the fuse, it would take about one minute for the fire to reach the train of powder, if the fuse was wet, and about half a minute if it was dry.

"The customary way of doing the work of blasting there was to first clean out the hole, then put the exploder in the bottom, then take other sticks of dynamite, slit the wrappers so they will spread out when tamped, place them on top of the exploder, and tamp them down. The holes are filled with dynamite to about 1½ feet from the top and then fine dirt or rock is put on top of that. A missed hole is loaded in the same way, but the dynamite sometimes comes 6 inches or closer to the top of the hole. After the dirt or rock is put on, none of the powder is exposed. Dynamite can catch fire from the spitting (sparks) of the fuse. It burns slowly, not much faster than fuse. The exploders were prepared on surface and brought down in a box, with the dynamite, in the bucket. After the holes were about ready to load, two men went to surface and got the explosives. After getting them, the two men would go down the shaft and one of them would get off at the seventh level to turn off the air and the other would go down to the last set and then roll or carry the wires up about 40 feet in the shaft and stay there. The bucket would go down to the bottom and the men there would get the dynamite and exploders, load the holes, split the fuses, and get ready to blast, and then two of the men would go up on the truck or the short ladder and pull the ladder up and put it on the sets. The six men would then be thus stationed: One at the seventh level; two in the bottom of the shaft; one 40 feet above the bottom; and two on the truck. The bucket would be in the middle of the bottom of the shaft. Santi and Latvala usually lighted the fuses on plaintiff's shift. When they were ready to light them the fire signals would be given.

They were: Three bells to hoist the bucket seven or eight feet, one bell to stop, two to lower it again, one to stop it at the bottom, and then one long bell to indicate that they were about to blast. After the fuses were lighted, a seven-bell signal bell was given to indicate that the miners wished to be hoisted to the seventh level. These signals were given by the man stationed 40 feet from the bottom, who could catch the truck as it ascended and go up with the rest. It took seven or eight seconds to give the seven-bell signal, two or three seconds to light the fuses, and about four or five minutes for the bucket to go from the bottom to the seventh level. The miners were usually at the seventh level about four or five minutes before the first blast. The bucket was usually started when the last of the seven bells was given. Because the signaling apparatus could not be relied on, Benny, the engineer, was instructed by defendant to hoist on any signal after the long bell, but the miners knew nothing about that. The fuses were lighted by each man taking in each hand about half the fuses he was to light and holding them over the flame of a candle.

"Holm was the foreman, and plaintiff, Maki, Rusciolelli, Santi, and Latvala were the miners, in plaintiff's crew. Plaintiff had limited experience in mining but had been working in this shaft about a year. September 17, 1909, this crew went to work at their usual time, 7 o'clock a. m., and met the outgoing crew at the seventh level. There were five missed holes left in the shaft by some preceding shift. It appears that the outgoing crew knew that, and so informed plaintiff's foreman. When plaintiff's crew got to the bottom they found a quantity of dirt which had been loosened by one of, but not removed by, the other shifts. It took plaintiff's crew about an hour to remove this dirt. Plaintiff and Latvala worked in the west end, Santi and Rusciolelli in the east end, and Holm and Maki in the middle of the shaft. No new holes were drilled that morning. Plaintiff and Latvala found five holes in the west end, not missed holes, but holes which had been blasted before; Santi and Rusciolelli found only three missed holes; but they also found some other holes (Rusciolelli could not say how many) in the east end. There were no holes in the middle. Plaintiff and Latvala together examined

the west end holes and found them all right to blast.
Santi and Rusciolelli did the same with the holes in
the east end. One of the men from each end (evi-
dently Santi and Latvala) counted the holes and told
Maki and Holm that they needed 14 exploders. There
were 14 holes in all to be blasted. Maki and Holm
went up to the surface for the exploders and dynamite
and there prepared 14 exploders, got the necessary
dynamite, and put them (in the box) in the bucket,
and went down the shaft. Holm got off at the seventh
level. Maki continued down to the last set and then
went up with the signal wires. The bucket continued
to the bottom. Plaintiff and Latvala together charged
the five holes on the west end. Santi and Rusciolelli
charged those on the east end; Santi putting the ex-
ploders and dynamite in, and Rusciolelli tamping the
dynamite. The holes were charged in the customary
way. All of the holes in the east end were within 3½
or 4 feet from the east end. When the holes were
charged, Santi and Latvala told Rusciolelli and plain-
tiff that they would put the dirt on the holes, and
went about doing so in the customary manner, and
plaintiff and Rusciolelli went up on the truck. The
ladder was then placed on the sets. At this time Santi
was in the bottom in the east end, Latvala in the west
end, plaintiff and Rusciolelli on the truck, Maki 40
feet up the shaft, and Holm on the seventh level.

"When Santi and Latvala were all ready to blast,
they directed Maki to give the fire signals, and he did
so. Santi and Latvala had their candles all ready to
light the fuses. When Maki had given the fire signal
he told them so. Santi and Latvala then asked each
other if they were all ready, if all the fuses were
split, and if they had them in their hands. They each
said they were ready, and they lighted their fuses
all together in the customary way; Santi lighting
those in the east end and Latvala those in the west
end. Santi was facing east and was right on the
east side of the bucket and the holes were east of him,
when he lighted the fuse. It took them two or three
seconds to light the fuse. Just as soon as they lighted
the fuses, they told Maki to give the signal to hoist
the bucket, and he immediately started to do so. He
rubbed the bare ends of the wires (which were then
clean and bright) together seven times in the custom-

ary manner. At that time Santi and Latvala were getting on the bucket. The bucket was not started. Then they said to Maki, 'What is the trouble? Ring again.' He told them that he had rung, but would ring again, and he did then ring again. The bucket did not start when he rang that time either. After that Santi, who was standing on the side of the bucket, hollered, 'Fire in the powder! Ring up quick!' Maki answered that he had rung already, but would ring again, and he did ring again the third time, but the bucket did not start. The fire referred to by Santi was a fire about two feet square which was then burning in the east end of the shaft. It was six or seven feet from the bucket. Nothing but the fuse was burning in the west end of the shaft. Maki, when attempting to give these signals, counted that he gave the seven bells. He was sure that he did so the first and second times. It was about three minutes anyway between the time he rang the first of those three seven-bell signals and the time of the first blast.

"An explosion occurred in the bottom of the shaft about the time when Maki finished giving the third of the seven-bell signals. The bucket did not start until after the first blast, or until at least three minutes after the first of the seven-bell signals was given. There was a delay of several minutes more than usual. The truck was not hoisted until about five minutes after the first blast occurred. Benny, the engineer of the puffer at the time, testified that only two 'dings' of the bell in the engine house, with an intermediate quivering of the hammer, resulted from Maki's efforts to give all those seven-bell signals. There was a conflict in his and the miners' testimony respecting the time of starting the bucket. Benny claims that after he had raised the bucket two or three feet, he felt a jar, which he ascribed to an explosion in the shaft.

"Neither plaintiff nor Maki saw, were told, heard, or knew that there was any missed hole or holes in the bottom of the shaft that morning, and plaintiff did not know of any danger from missed holes until the time of the blast. Neither of them was over in the east side of the shaft that morning. No dynamite was left in the shaft that morning by anybody in plaintiff's crew except what was put in the holes.

Shortly after the first hole blasted, the others commenced and continued to go off; the last hole going off when Maki, who climbed up, reached the tenth level.

"Rusciolelli got into, and plaintiff was trying to get into, the twelfth level when the first blast occurred. Santi and Latvala were killed, the plaintiff was frightfully and permanently injured, Rusciolelli was nearly smothered, and Maki was injured, as a result of the explosions. The blasts occurred about 10 o'clock a. m. Holm climbed down from the seventh level to assist the men in getting out. A man came up on the skip from the seventh level to surface and reported the accident, and Benny was then at the shaft and very much discouraged.

"The testimony of defendant's master mechanic shows: That this puffer engine was an old, second-hand one, purchased from the Chicago House Wrecking Company. In May, 1909, one of the teeth fell out of the gear and dropped in between two wheels and caused the bending of the shaft, which affected the throw of the valves, made the engine lame on one side, caused it to run in a jerky manner, and caused the friction to slip. The puffer was in bad condition all the time he was there after May, 1909. Although an attempt was made to repair it and straighten the shaft, the shaft did not stay straight, and the engine never worked well afterwards. Frequent complaints were made to him of the bad condition of the engine before September 17, 1909, and about twice a month he called the superintendent's attention to the bad condition of the engine, and advised a new shaft and gear wheel, but nothing was ever done about it; the condition of the pipe line which carried steam to the puffer (which was 600 or 800 feet long and had 13 quarter-turns in it, when it should have been straighter and shorter) was such that water would accumulate in the cylinder, and the engineer had to be very careful in starting, and start slowly, in order not to knock out the cylinder head.

"Benny, although claiming otherwise at times, admitted that the puffer was not in right condition; that it would start quick at certain places; might jerk; was not in good shape; did not work as it was supposed to; was out of repair; did not run very steadily;

and that he had to use more than ordinary care and
time in starting it with men on it for fear of hurting
them.    On cross-examination by defendant's counsel
(referring to the time of the accident), he testified:

"'Q. Was the engine prevented in any way from immediately
beginning to work by any condition of its boxes or bent shaft?
"'A. Yes, sir.'

"The spring and magnet of the bell used in con-
nection with the truck and bucket were not covered
with a removable cover, but were wholly uncovered.
They should have been so covered.    Such a bell is a
complicated piece of machinery and requires constant
attention and inspection to keep it in condition, and
should be thoroughly inspected at least once a week
and casually looked over every day to see that there
is no dirt at any place where it might affect it; to see
that the wires are in proper condition, that the springs
are not too tight or too loose, and that there is no cor-
rosion in the base of the clapper or elsewhere which
would be liable to interfere with the working of the
bell; to see that the platinum point is not burned
through where the contact is, that there are no
loose contacts, that the coil of the bell does not get
open, and that there is no give to the springs.    The
coils should be sharply looked over at least once a
week and kept clean by passing some sharp instru-
ment over the ends of them.    Dirt and corrosion
might be in such a place, or in such a state or condi-
tion, in the bell, or so caught or accumulated in the
bell, as to at any time temporarily put the bell out of
order so that it would not respond for a few minutes,
and afterwards would respond.    That the bell rings
clearly would not justify failure to test and examine
it.    If the bell was not carefully inspected once a week
in the manner above stated and looked over every day,
the chances are that the bell would fail to respond.
Without a cover and this examination and inspection,
the bell would be unsafe to use for the purpose for
which the bell in question was used.    The bell might
also fail to act, when the bell itself was in good con-
dition and proper connections were made at the bare
ends of the wires, by reason of the condition of the
wires in the shaft.    The batteries should also have
been frequently tested with a voltmeter and ammeter

to get their strength and amperage. It would not be safe to operate the bell in question without the precautions hereinbefore outlined. Witness Benny was the only one to whom the duty of inspection of the signaling apparatus was intrusted. He did not know much about a bell or when or how to inspect a bell. He never examined this bell or signaling apparatus at all except when it failed to act. He did not look at the bell at all in the way of examination or inspection for at least a month before the time of the accident to plaintiff. Nobody inspected the wires in the shaft at all. Some days the bell rang weaker than others. It was bucking both before and after the accident. It was bucking, and Benny had trouble with it, four or five days before the accident. It wiggled and did not ring right. The hammer would not strike against the gong and it was not tight enough. Nobody inspected the batteries until they played out entirely. Plaintiff, before the time he was hurt, never noticed and was never warned or informed of any defect in the hoisting or signaling apparatus."

In a few instances counsel for appellee in their brief have questioned the accuracy of certain portions of this statement and have referred the court to pages of the record claimed to support their objections. The witness Benny, the engineer, whose duty it was to operate this hoisting apparatus in response to signals on the electric bell in his room, given to him by the miners working at the bottom of the shaft, was an employee of defendant company. He was called by plaintiff for cross-examination under the statute. A careful reading of his testimony discloses that the portions of the statement of facts of plaintiff, objected to, which refer to him are supported by his testimony, and that as to the other portions objected to, which would require too much space for extended comment, they are all fairly supported by the testimony.

In the examination of this record the fact must be kept constantly in view that a verdict was directed by the court against plaintiff, and the rule that the

evidence presented on the part of plaintiff must be considered in the light most favorable to him must be applied.

The question to be determined by this court is not as to to the weight of the evidence produced on the part of plaintiff but whether there was evidence which should have been submitted to the jury for consideration.

In the opinion handed down in this case when it was here upon demurrer, as cited, *supra,* where the construction of the first count of the declaration was under consideration and the issue presented by the pleading was stated, Chief Justice OSTRANDER, speaking for the court, said:

"With regard to the hoisting apparatus the declaration appears upon analysis to be sufficient to warrant the introduction of testimony and to support a recovery in accordance with the following construction which we place upon the language employed. The defendant had furnished a single method of conveying men to and from the seventh level [bottom of the shaft] of the mine. A part of the apparatus and machinery was the one for signaling, by the use of which men in the mine might convey to others on the surface notice of a desire to be taken from the mine or from the particular level. It was the duty of defendant to maintain all of this apparatus and machinery in a condition suitable to prompt action and service, and a duty to promptly respond to signals indicating that the men on the seventh level [bottom of that shaft] desired to leave that level [place]. Proper signals were given, or were attempted to be given, by means of the apparatus provided, upon the occasion in question, by plaintiff or by some of the men with whom he was employed. They were not responded to. The failure to respond contributed to plaintiff's injury, because he was thereby prevented from avoiding or escaping the results of an explosion. The failure to respond was due to some fault, defect in, or some failure of the machinery and apparatus described. We think plaintiff is not required to point

out the particular fault, defect, or cause of failure. He could not be reasonably expected to know whether the signals were received at the surface—whether the apparatus for signaling failed, or whether an employee disregarded them if received, or whether in attempting to send the cage, or car, for the men, in answer to the signals, some part of the other machinery or apparatus was found to be defective or otherwise at fault.   *   *   *   All crews used explosives. It was the duty of defendant to notify plaintiff if the members of another crew left explosives in the shaft, because, if such notification was not given, there would exist an unknown, and perhaps undiscoverable, hazard to which plaintiff should not be exposed. This is the reasonable meaning."

The opinion further stated:

"But this construction is the one to which plaintiff should be limited in the introduction of testimony, and indicates the issue presented by the pleading to which plaintiff is restricted."

No question has ever been raised as to the sufficiency of the second count, which in substance avers the defendant's duty to furnish plaintiff reasonably safe means of egress from the shaft at all necessary times and to convey plaintiff to a place of safety at any time of danger from explosions, and that it undertook to perform this duty by providing hoisting and signaling apparatus and devices. A failure to perform each of these duties was duly assigned. No questions now arise upon the pleadings.

It will be unnecessary to quote at length the reasons given by the court in directing a verdict against plaintiff, nor will it be necessary to discuss at length all of such reasons. If the court was in error in any of its conclusions, plaintiff is entitled to a reversal.

We will first consider plaintiff's contention that there was evidence in the case to submit to the jury upon the question of negligence charged against defendant in failing to maintain the signaling ap-

paratus in a condition suitable to prompt action and service, and the relation of such negligence to plaintiff's injury. The accuracy of the portion of the statement of facts which covers the condition of the signaling apparatus and its operation, and what was done by the workman Maki in making the signals, is only questioned by counsel for defendant as to the following sentence:

"Because the signaling apparatus could not be relied on, Benny, the engineer, was instructed by defendant to hoist on any signal after the long bell."

These objections have all been considered generally, but this is a very important matter bearing upon the unreliable condition of the signaling apparatus known to defendant and requires specific consideration. We find in Benny's testimony, referring to these instructions, which he at times speaks of as an agreement, the following:

"Q. Then why did you make this agreement to hoist on any other signal?
"A. It was an agreement that perhaps it would not ring right sometimes.
"Q. You could not rely on the bell?
"A. Sometimes on the bell, sometimes perhaps it was the ring.
"Q. You could not rely on the bell?
"A. I could not rely on the ringing either.
"Q. You could not rely on the bell or the ringing?
"A. No, sir.   *   *   *   We made this agreement to hoist upon any bell after that long, long bell before I started to work. Those were my instructions before I started to work."

Whatever modification he may have made as to any of his testimony is of no importance in determining whether there was evidence to support plaintiff's contention.

The portion of the statement of facts, objected to above, gives, we think, a fair inference to be drawn

from this testimony. Upon the question of the condition of this signaling apparatus, there was testimony of this witness tending to show that during the time before this accident, while he operated this puffer engine to hoist the men who were doing blasting at the bottom of the shaft, upon signals given from below, the bell was more or less uncertain and unreliable in its operation, and at the time of the accident that after the long signal the three seven-bell signals testified to as given from the bottom of the shaft were not transmitted. Benny testified that one bell came, and then the clapper quivered, and then the second "ding." His words are:

"It just went 'ding' and then the hammer of the bell trembled and did not make any sound, didn't strike the bell, and after a pause it struck hard enough to make another 'ding.' There were two 'dings.'"

There is evidence that an electric bell should be covered to keep out the dust, and that it should be inspected frequently to ascertain its condition; that the screws will jar loose and it will not answer signals. There is evidence in this record tending to show a lack of proper inspection. It tends to show that Benny, who knew nothing about such apparatus, who was the one who ordinarily inspected the bell, never paid attention to it unless something went wrong.

The testimony relative to giving the required signals from 40 feet above the bottom of the shaft is not disputed and tends to show that the uncovered ends of the copper wire were bright and that all of the signals were attempted to be accurately transmitted. Therefore it cannot be said, in our opinion, that there was no evidence to submit to the consideration of the jury upon the question of the imperfect condition of the signaling apparatus.

We will next consider the claimed negligence of defendant in not maintaining the hoisting machinery in a suitable condition for prompt action and service to protect these miners from injury when blasts were being fired. That such a duty rested upon defendant is not disputed, but it is contended on the part of defendant that there is no evidence in the case tending to show that the hoisting apparatus was in an unsuitable condition, or that, if it was, such condition contributed to plaintiff's injury. It is admitted, and was so found by the trial court, that the puffer engine which operated the hoisting apparatus was a second-hand engine, "that it was old, and that the company had had warning that it was somewhat out of repair; in fact, the company made some repairs on it, at least one defect, the bent shaft, having been repaired." The contention on the part of plaintiff is that there is evidence in the record tending to show that it would not operate quickly because, by reason of the bent shaft, it was "lame" on one side; that one of the valves was slow, and that it required to be started slowly; that by reason of its defects the parts connected with the shaft must be in a certain position or it could be started only with difficulty; that at the time of this accident there was a delay of about three minutes before the engine started after the first seven-bell signal, which delay was recognized on the trial by counsel for defendant in a request to direct a verdict against plaintiff for contributory negligence in remaining in a place of obvious danger for a period of three minutes. In our opinion this contention is sustained by the record, and there was evidence upon the question of the condition of the hoisting apparatus to be submitted to the jury.

The record shows without dispute that the foreman of each shift was required to give warning to the succeeding foreman if missed holes had been left in the shaft. It is contended by plaintiff, and the record

supports the claim, that there was evidence tending to show that plaintiff's crew left no explosives in the shaft after the blast which caused the injury had been prepared for firing, and that there was evidence tending to show that, after the fuses were fired for this blast, explosives in the bottom of the shaft took fire and are claimed to have contributed to plaintiff's injury by prematurely exploding the blast. This was relevant to the question of a safe place and the presence of latent danger not disclosed to plaintiff and his crew. It should have been submitted to the jury.

It is contended by plaintiff that the negligence of the foreman of the preceding crew and of plaintiff's crew, to whom was delegated the duty to warn plaintiff and other members of the crew of explosives left in the bottom of the shaft, and also the negligence of the operator of the hoisting apparatus, was the negligence of defendant; that the duty to warn and the duty to promptly operate the hoisting apparatus when signaled were nondelegable duties, and the persons empowered to perform such duties were vice principals and not fellow-servants of the plaintiff.

The fundamental principle that it is the duty of the master to furnish a safe place for the servant in which to work is thoroughly settled, as is also his duty to continue to keep the place safe, and—

"That this duty is one which cannot be delegated by the master so that the employee engaged to do the work of making the premises safe is to be treated as a fellow-servant of those who are employed and engaged in the general work for which the premises are intended." *Beesley* v. *F. W. Wheeler & Co.,* 103 Mich. 211 (61 N. W. 658, 27 L. R. A. 266).

Numerous decisions of this court to the same effect might be cited. See, also *Orso* v. *Engineering Co.,* 164 Mich. 568 (129 N. W. 673), and cases cited.

The other proposition is that the engineer, whose duty it was to operate and control this hoisting ap-

paratus, upon which these miners were required to be lifted from their working place to escape imminent danger, was a vice principal and not a fellow-servant. These miners, including plaintiff, were working under contract at $25 per foot. As appears in the statement of facts, which is not disputed, each shift was provided with a shift boss, chosen, paid, and discharged by the employer without consultation with them, and each shift boss was required to warn and notify the boss of the succeeding shift as to explosives left by his shift. Under the circumstances of this case, therefore, the relation of plaintiff to such engineer and shift boss was not that of a fellow-servant. The engineer and the shift boss performed for the master the nondelegable duty of keeping safe the place where the work was performed. *Courtois* v. *Paper Co.*, 172 Mich. 305 (137 N. W. 699), and cases cited. The nondelegable duty of the shift boss was to prevent plaintiff from being kept in ignorance of and exposed to an unknown hazard. The engineer's nondelegable duty related to the prompt operation of the hoisting apparatus and to obey his instructions relative to signals. The signaling apparatus, the engineer, and the hoisting apparatus were the instrumentalities provided by the defendant, under its contract, in maintaining a safe place for plaintiff to work and removing him from imminent peril necessarily incident to the employment when plaintiff so required.

It is apparent that under the contract of employment the duty of the defendant to the plaintiff to continuously provide him a safe place in which to perform his work could only be fulfilled by the performance of such duty by means of signaling apparatus, the engineer, and the hoisting apparatus, and a failure in any respect in such performance, for any reason, by any of these instrumentalities, would of necessity be a failure in the performance of an absolute duty imposed upon the employer. It is not disputed

that these instrumentalities were absolutely necessary for the safety of the plaintiff in the prosecution of his work. They were the only instrumentalities provided by defendant for that purpose, and their prompt and efficient operation was included in the contract of hiring. This court has frequently affirmed the principle here involved.

In the case of *Kaukola* v. *Mining Co.*, 159 Mich. 689, at page 699 (124 N. W. 591), Mr. Justice STONE, speaking for the court, said:

"The lighting of this passageway or thoroughfare of the mine, far distant from the working place of those who passed through them—it being always dark in the mine—was just as necessary for the safety of the men as it was to have the walls and floors in a proper condition. It was one of the 'instrumentalities' which it was necessary to provide to enable the men to do their * * * work safely. It was a thing which it was necessary to keep permanently in condition. Unlike the case of *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236 [109 N. W. 431], here the place furnished was a permanent place of work, and not one where the conditions were constantly changing. Here, in our opinion, the rule of a safe place to be furnished by the master applies. In *Cristanelli* v. *Mining Co.*, 154 Mich. 423 [117 N. W. 910], it was held that the engineer of a mining hoist, in so far as it is his duty to keep the place safe, is not the fellow-servant of an employee engaged in loading machinery upon the skip at the collar of the shaft."

There is evidence in the case on the part of plaintiff tending to show the negligence of the engineer, who operated this hoisting apparatus, in not acting promptly on receiving the first stroke of the bell he was waiting for, both in his own testimony and the testimony of the miners at the bottom of the shaft. The engineer's negligence was a question of fact and, if established, was the negligence of a vice principal to be imputed to the defendant. This question should also have been submitted to the jury.

For the reasons stated, the trial court was in error in directing a verdict in favor of defendant.

The judgment of the circuit court is reversed, and a new trial ordered.

STEERE, C. J., and MOORE and KUHN, JJ., concurred with McALVAY, J.

OSTRANDER, J.   I agree with my Brother McALVAY that there was sufficient testimony relating to the condition of the signaling apparatus and the hoisting machinery to carry the case to the jury.   There was some testimony also favorable to plaintiff upon the subject of a latent danger arising from the fact that dynamite was left in the chamber by a crew of men which plaintiff's crew followed in their work.   For these reasons I concur in reversing the judgment and granting a new trial.   But that any doctrine of the law of safe place is involved in this case, or that the engineer hired by the defendant was its vice principal, who in managing the hoisting machinery was performing a nondelegable duty, are propositions advanced by Brother McALVAY which, in my opinion, cannot be sustained.   It is not alleged in the declaration that the engineer was an unskillful or incompetent servant.   It is not alleged that, having the right to be furnished a safe place in which to work, the men were furnished an unsafe place.   On the contrary, it is the theory of the plaintiff that, being set to work in a place which by his labors and those of his fellow workmen was from time to time made unsafe, a place to flee from, it was the duty of the defendant to provide a certain and speedy means of leaving the place.   It is alleged that apparatus for this purpose was provided, but that it was infirm and in the particular instance was operated so tardily that the means of self-destruction, which plaintiff and his fellows had set in motion, anticipated the opera-

tion of the apparatus intended for their escape. The fault charged to the engineer in this case is not the failure to inspect or to install suitable apparatus or to keep that installed in repair. So far as his conduct is concerned, the case would be the same if it appeared or was admitted that the apparatus provided by defendant to take the men away from danger was perfect and in perfect order and he a competent man, who tardily, so tardily as to indicate negligence on his part, obeyed the signal. Unless upon a finding of these facts defendant's negligence would be held to be made out, the negligence of the engineer is not a ground for recovery. The work he performed, and should perhaps have performed more promptly, was the work of operating the mine. Suppose that, instead of hoisting these miners in a cage, defendant had provided a track and cars and a locomotive which, in the charge of a competent crew, stood near the chamber in which the blasting was done and to which the men, after lighting the fuses, repaired and were drawn away from danger. If upon an occasion the engineer so tardily responded to signals to move the train that some of the men were injured by the blast, would it be held that his negligence could be imputed to the master; that the duty in the premises was nondelegable; that in performing it he was a vice principal? I grant that in this case the necessity for prompt action on the part of the engineer existed; that the agreed signal was a notice of peril; and that the duty of the engineer was a most important one. Not less important was the duty of each miner to properly light his fuse and of one of them to give the necessary signal to the engineer. The defendant is not held as an insurer that none of those employed in the operation would act in a negligent manner. If defendant used suitable apparatus, kept it in order, and employed in its operation a trustworthy, competent engineer, it had performed its duty.

In *Layzell* v. *Coal Co.*, 156 Mich. 268 (117 N. W. 179, 120 N. W. 996), in considering the duty imposed upon owners of coal mines by a statute which required "that only a competent and trustworthy engineer shall be permitted to operate the cages and hoisting devices in all coal mines in this State," in which plaintiff claimed to have been injured by the negligence of one performing the indicated duty, the court declined to go farther than I have herein indicated. See, also, *Walkowski* v. *Consolidated Mines*, 115 Mich. 629 (73 N. W. 895, 41 L. R. A. 33).

BROOKE, STONE, and BIRD, JJ., concurred with OSTRANDER, J.