AHO *v.* CLEVELAND CLIFFS IRON CO.

MASTER AND SERVANT—NEGLIGENCE—FELLOW SERVANT—DELEGABLE DUTY—INSTRUCTIONS.

In an action for personal injuries caused by a fall of rock on plaintiff in defendant's mine, while plaintiff and another miner were engaged in timbering a passageway, the duty to warn plaintiff of the danger being a delegable one, which duty defendant fully performed when it selected a competent fellow-workman, it was not liable for the fellow servant's negligence, and the court was in error in refusing to charge, as requested by defendant, that plaintiff's co-worker was a fellow servant, and that defendant would not be responsible for his negligence, and instead charged that if the defendant knew of the dangerous condition there, either because of the experience of said co-worker and another in working there before plaintiff came, or had learned it in any other way, or could have learned it by the exercise of reasonable care, and if plaintiff was unaware of the dangerous condition, if it existed, then as the undisputed evidence showed that the shift boss did not warn, it was the duty of the co-worker to do so, and if he failed his failure was the failure of defendant and the verdict should be for plaintiff; the court practically directed a verdict for plaintiff.

Error to Marquette; O'Brien, J., presiding. Submitted June 24, 1915. (Docket No. 28.) Decided September 28, 1915.

Case by John Aho against the Cleveland Cliffs Iron Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*William P. Belden,* for appellant.

*Le Gendre & Driscoll,* for appellee.

STONE, J.   Action on the case to recover damages for injuries sustained by the plaintiff in the Princeton mine, by falling rock, on June 23, 1910, while in the employ of the defendant.   This mine had two shafts, known respectively as Nos. 1 and 2.   At the time of the accident the defendant was extending a permanent passageway on the bottom level from No. 1 shaft southerly in the direction of No. 2 shaft, and which would ultimately be connected with that shaft.   This passageway was mostly through solid rock.   It was what is called a rock drift.   It was about 7 feet high, and 7 feet wide.   One track was constructed therein for tram cars. This drift was known as No. 5 contract, and at the time of the accident had been extended a distance of about 1,300 feet from No. 1 shaft.   It had been deemed unnecessary to timber this drift through its main portion.   However, a few days prior to the injury complained of a change of ground was encountered, showing that the drift was entering softer ground, which made it necessary to timber the drift for safety.   It should be said that there was a conflict in the evidence at the trial as to the character and condition of the rock in the drift at and near the place where the injury occurred.   The miners began the installation of these timber sets 25 or 30 feet from the end of the drift, so as to anchor them in solid ground.   The timbers used for this purpose were brought down in the skip at the shaft, and were taken to the working place at the end of the drift.   The posts were 8 feet high, with an 8-foot cap on top of them, and lagging was placed over the caps, as is usual in timbering iron mines. Miners usually work in pairs.   If one man is sick or does not report for work, it is usual to call a man from some other part of the mine to take his place.

Prior to the day of the injury Walter Helston and Andrew Soderman were working in this shaft.   At times three men had worked there; the third man being

one John Koski. On the morning of June 23, 1910, there were two sets of timber in place, so that the drift had been timbered for a distance of 16 feet. On that morning Helston was the only member of this gang who reported for work. Upon informing his shift boss that his partner had not come, the shift boss requested the shift boss at No. 2 shaft to furnish a man to fill the vacancy, and the plaintiff was sent over. The plaintiff was at that time 36 years old. He was an experienced miner, having worked in iron mines over ten years before this injury, and had worked in the Princeton mine and that vicinity nearly nine years. He had worked about five years in No. 2 shaft, and altogether about a month in No. 1 shaft, but had not worked in this contract. Helston was a miner of eight years' experience who had worked in No. 5 contract about two months before plaintiff was hurt.

The plaintiff found Helston at the bottom of shaft No. 1, and, without waiting to see their shift boss, they immediately went to work taking timbers from the skip out to their working place at the end of No. 5 contract. They walked through the timber sets which had been completed, and began work near the breast of the drift. Plaintiff testified that he understood that the fact that they were putting in timber sets indicated that the rock was not as sound or good at that point, and that the men were afraid it might cave; that he understood the purpose of putting up the timber sets was to prevent the roof of the drift from caving in on the men, and he also understood that he and Helston were to continue putting up those timbers.

There was a conflict in the testimony as to whether or not there were slips or seams in the rock at this point. There was evidence that the usual and customary method by which miners protect themselves against falling rock, from any cause whatever, is to sound the back or roof of the drift with iron bars or picks, before

beginning work in any place. The plaintiff testified that he knew about seams in rock and how to guard against them. On entering the working place that morning they began at once to bar down the loose rock. Helston did the actual barring, and the plaintiff held one end of the plank on which he stood, the plaintiff being under the lagging. They continued this work for at least half an hour, in the course of which Helston barred down two or three large chunks and quite a number of small ones. Plaintiff watched Helston's work. On cross-examination he testified:

"*Q.* Did you see in the back of the drift this chunk which afterwards fell on you; * * * did you see it before?

"*A.* I couldn't see no fault in that back after Helston cleaned it, or trimmed it off.

"*Q.* Did you look at it?

"*A.* Yes, I watched it right along when Helston did trimming of the back.

"*Q.* Helston said that he struck with his bar and his pick the chunk which afterwards fell on you. Did you see him do that?

"*A.* Yes; he did pick some loose right from there, and sounded the place, and it seems to be all right."

Helston testified that he barred and picked the back in the customary way, including the place from which the rock later fell, and that it looked sound to him when he got through with this work, and that he knew there were seams in the back, but he did not tell plaintiff about them. He was not sure whether he told plaintiff on the completion of this work that the place was all right, but it seemed "to be good, after I was through with the back." Soon after the completion of this work, plaintiff took a sledge and began breaking chunks of rock in the dirt pile. In doing so he stepped out from under the lagging, and stood directly under the exposed roof or back of the drift. About an hour after they entered the drift, and in the neighborhood

of 15 minutes after Helston ceased trying the rock, a large chunk of rock fell from directly above the plaintiff and severely injured him, breaking both his legs, and inflicting other serious injuries. There was a conflict in the evidence as to how far the place of injury was from the breast of the drift. The plaintiff, in part, testified as follows:

"*Q.* State whether or not you were given any warning of any kind by anybody before you were hurt that day.

"*A.* Nothing at all.

"*Q.* Did you know that there were any slips in the hanging there at the place you were hurt—slips or seams?

"*A.* I didn't know anything about it. I was holding the stage at the time, and Walter was sounding and picking the back there, and I saw he got some loose off there, and the way it seemed to me it was good.

"*Q.* As far as you could see and tell from the sounding he did, it was all right?

"*A.* Yes; it was solid. First he used a bar and took down those big ones, and after that he went over it with his pick and took down the small ones, and sound it, and then we took the staging off. * * *

"*Q.* And did you go in past the place where you were hurt at any time, or did you stay outside of that at all times?

"*A.* I didn't have any time to pass anywhere. Right after we took the staging away, I began to break those rocks. It was about an hour from the time I got into that place until I got hurt. I didn't see in the drift any further than the light of my candle would throw from the place where I was standing when hurt; that was all I saw.

"*Q.* If you knew that there were slips up in the back of that place, or that it was dangerous to work in there, what would you do?

"*A.* I would not go there. I would try to fix it some way that it would not hurt me."

On his cross-examination the following occurred:

"*Q.* John, what is the principal risk which a miner takes in doing work of this character?

"*A.* Back is the worst place, if you don't take good care of your back.

"*Q.* What happens to you if you don't take good care of the back?

"*A.* You get hurt.

"*Q.* You mean by chunks of ore or rock falling down?

"*A.* Yes, sir.

"*Q.* What effect, if any, does it have if the back is damp or wet?

"*A.* It is a good deal more dangerous, and it's bound to loosen, even the solid place of the back.

"*Q.* What effect does it have, if any, in rock if you can see cracks or seams?

"*A.* It's a good deal softer, or easier to fall in some kind of rock.

"*Q.* When you find these cracks and seams, when driving a rock drift, what's the proper thing to do?

"*A.* You have to examine it, see if they are dangerous or liable to fall, and if you see any such, then you must use those piling posts—forepoles.

"*Q.* Now John, how did you learn that?

"*A.* I saw the older miners had that practice, and through my own experience I saw that it was necessary to do so.

"*Q.* On this morning in question did you and Walter talk about using piling?

"*A.* We didn't have any time to talk anything about that that morning.    *    *    *

"*Q.* John, was there room to stick the piling over the top of this cap at this place?

"*A.* Yes; there was plenty of room.

"*Q.* Did you think it was necessary to have piling at that place?

"*A.* It would be necessary all right to have pilings in back of that place where we was.

"*Q.* John, you used piling in other parts of the Princeton mine, haven't you?

"*A.* Yes, sir; I guess there is some yet what I been putting up.    *    *    *

"*Q.* Now, when you went to this place that morning, did you think it needed piling over this cap as a protection, before setting up that new timber set?

"*A.* I didn't know that that place was such, because I didn't have any time to examine the place, and I didn't know the place, and I wasn't even on the dirt pile over there."

Helston testified that there were no poles or piling suitable for forepoles in the drift, but it was undisputed that the defendant kept on hand on the surface a supply of all kinds of timber used in the mine, including piling. It was undisputed that the work in which these men were engaged was purely construction work, and that this drift was being tunneled through the rock to furnish a passageway from one shaft to the other. It also appeared without dispute that the very purpose of putting in these timber sets was to protect the men from injury from falling pieces of rock, and that plaintiff and Helston, two experienced miners, were employed to do this work. The defendant had a superintendent in charge of the Princeton mine and other mines operated by defendant in that district. It also employed a mining captain, who had charge, under the superintendent, of this mine. In addition, the defendant employed a shift boss at each of these shifts. About 25 men were employed at No. 1 shaft at the time.

At the conclusion of the testimony the defendant moved the court to direct a verdict in its favor, on the grounds that the plaintiff had failed to prove any negligence of defendant; that the risk, if there was any risk, was the usual risk incident to mining operations, which the plaintiff assumed by the employment; that his own carelessness and negligence contributed to the injury; and also that the carelessness and negligence of Helston, plaintiff's fellow servant, contributed to the injury. The motion was overruled, and the defendant duly excepted. The case was then submitted to the jury, and they returned a verdict for the plaintiff.

There was a motion for a new trial, involving the questions above referred to, and also the proposition that the verdict was contrary to the overwhelming weight of the evidence. The motion was overruled, and exception duly taken.

The defendant has brought the case here for review, and the following claims are made by appropriate assignments of error:

(1) That upon the undisputed facts plaintiff failed to prove or establish any negligence of defendant.

(2) That if any warning was necessary this duty was delegable.

(3) That the court erred in its charge as indicated.

(4) That defendant's motion for a new trial should have been granted.

There is no claim here on the part of the plaintiff that the doctrine of "safe place," as that term is usually expressed, applies here. In fact, the court charged the jury upon that subject as follows:

"Under the circumstances of this case, the defendant did not owe the duty to the plaintiff to furnish him a reasonably safe place in which to work. The so-called 'safe place' doctrine has no application to this place. The plaintiff and Walter Helston were engaged at the time of the accident in timbering this drift for the purpose of making it safe for use as a passageway."

The defendant's sixth request to charge was as follows:

"Plaintiff's partner, Walter Helston, must be regarded as the fellow workman of the plaintiff, and if he was negligent in any respect, either in failing to tell the plaintiff about the risks to be incurred at this working place, or in the manner in which he was performing his duties on the morning in question, then I charge you that the plaintiff cannot assert such negligence as a ground of recovery against the defendant, because it would not be responsible for such negligent acts of Walter Helston."

This request was refused. Upon that subject the court charged the jury as follows:

"It appears from some of the evidence in the case, and I think from all of the evidence, * * * previous to the time when this piece of ground fell upon the plaintiff, Helston had inspected the ground by barring it, and pinching down whatever loose ground he could find in the back, and that it was determined that it was safe. Now, gentlemen of the jury, if the situation there was such, if the nature and character of that ground was such that after an inspection of the kind made by Helston the ground would appear to have been safe, but was not, in fact, really safe, and if you find from the evidence in the case that the treacherous character of the ground, if you find that it was treacherous, was known to the defendant, either because of the experience that Helston and his partner had in working in there before the plaintiff came to that place, or had learned it in any other way, or could have learned it by the exercise of reasonable and ordinary care and skill in carrying on the business of mining in that drift, and you further find from the evidence that the plaintiff was unaware of that condition of the ground, if it so existed, then, gentlemen of the jury, I charge you that, as the undisputed evidence shows that the shift boss did not warn in regard to the nature and character of that ground, it was the duty of Helston to have done it, and if he failed to do it, if he failed to warn the plaintiff, his failure is the failure of the company, and your verdict in that event should be for the plaintiff, providing you have found that a man of reasonable care and observation working in that drift, the same length of time the plaintiff was working there, and under the same conditions would not have known and appreciated the danger of that ground falling, under the circumstances and conditions under which it did fall."

We think this was reversible error. By the refusal to give defendant's sixth request, and by the portion of the charge just quoted, the trial court practically directed a verdict for the plaintiff. Not only was the

question of Helston's negligence submitted to the jury, but they were instructed that, as matter of law, the failure of Helston to give this warning constituted the failure of the defendant, for which it would be liable. Under our repeated decisions we think that it must be held that Helston was the fellow servant of the plaintiff. The duty to warn in work of this character is à delegable duty, which is fully performed when the employer selects a suitable and competent fellow workman, and makes it his duty to give the warning. Helston did not stand in the relation of foreman or shift boss to plaintiff. As was held in *Avikainen* v. *Mining Co.,* 160 Mich. 375 (125 N. W. 545, 136 Am. St. Rep. 443), Helston was simply a fellow miner of the plaintiff, and did not by reason of his seniority in the work at that place represent the defendant, so as to make it liable for his negligence, if any. *Amoe* v. *Engineering Works,* 151 Mich. 212 (114 N. W. 1010) ; *Kaaro* v. *Mining Co.,* 178 Mich. 661 (146 N. W. 149) ; *Mikolojczak* v. *Chemical Co.,* 129 Mich. 80 (88 N. W. 75) ; *Mesich* v. *Mining Co.,* 184 Mich. 363 (151 N. W. 564) ; *Lahti* v. *Mining Co.,* 186 Mich. 18 (152 N. W. 907) ; *Juntunen* v. *Mining Co.,* 184 Mich. 341 (151 N. W. 571) ; *Koskell* v. *Mining Co.,* 182 Mich. 586 (148 N. W. 699) ; *Andrews* v. *Mining Co.,* 180 Mich. 72 (146 N. W. 394).

Counsel for plaintiff has called our attention to *Panela* v. *Mining Co.,* 177 Mich. 669 (144 N. W. 528). It should be remembered that in that case the plaintiff was engaged in work of a character which we held entitled him to the protection of the safe place doctrine.

Without holding that there was no evidence of any negligence of defendant which might have warranted the submission of that question to the jury, under proper instructions, we are of opinion that there was prejudicial error in the charge as given, and for the

reasons pointed out, the judgment of the circuit court is reversed, and a new trial granted.

BROOKE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.