LAHTI *v.* TAMARACK MINING CO.

1. MASTER AND SERVANT—MINES AND MINING—FELLOW-SERVANTS —LIGHTING.

Negligence of defendant's employee, in charge of a tram car operated along a crosscut that the miners traversed in going to and from work, in neglecting or omitting to place a light at the head of the car, as required by the employer, for the safety of employees, for the alleged reason that his headlight became broken or out of order at the beginning of the trip, was an act of a fellow-servant

of another employee engaged as a miner, for which no right of action arose in favor of the injured servant.

2. SAME—SAFE PLACE.
Where the master has provided a safe place to work and suitable tools, and appliances with which to perform the same, the negligent use of such instrumentalities by a fellow-employee is not chargeable to the master as the negligence of an *alter ego*.

3. SAME.
Nor was defendant liable on the theory that it had not provided a reasonably sufficient lighting system so as to make the operation of its mine safe, where the conductor had been duly furnished with lamps and instructed to place a lighted lamp upon the front of every moving train.
KUHN, BIRD, and MOORE, JJ., dissenting.

Error to Houghton; Cooper, J., presiding. Submitted November 13, 1914. (Docket No. 48.) Decided June 7, 1915.

Case by John Lahti against the Tamarack Mining Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*Allen F. Rees* (*D. L. Robinson* and *A. E. Petermann*, of counsel), for appellant.

*Le Gendre & Driscoll*, for appellee.

STONE, J. Action for damages by reason of the injury of the plaintiff in a mine of defendant on the morning of March 19, 1910, on the fifteenth level of No. 3 North Tamarack shaft. This was a perpendicular shaft. In order to reach the vein from the shaft a crosscut was driven in barren ground west from the shaft until the vein was reached. At the time of the accident the crosscut from the shaft to the vein was somewhere between 700 and 1,000 feet long. At the point where the crosscut started from the shaft

there was a room or opening, which was called the plat. At this point the crosscut was wider, and it was about 50 feet or more from the shaft before the crosscut narrowed down to its average size. The crosscut was about five feet high on the average, and about the same in width. It is straight, so that one could see a light through it from one end to the other. When the crosscut reached the vein there was a drift along the vein south of about 1,000 feet long. The copper rock was mined and brought down to the drift, and along the floor of the drift, and continuing into the crosscut and to the shaft, was a track built similar to a railroad track, save that the rails were a great deal smaller in size. On this track cars called tram cars were run to carry the rock from the drifts to the shaft. These cars were 4 feet high from the track and 3 feet 8 inches wide. The motive power to pull the cars was furnished by means of an endless cable which ran through the drift and crosscut, and which was run by means of a compressed air engine and a drum located at the junction of the drift and the crosscut. The cable coming from the crosscut into the drift went in a straight line on the drum of the engine. There were four or five rounds of cable around the drum, so as to give the cable a grip on the engine. The cable then left the drum and was carried along the floor of the drift to the end of the drift and onto a wheel at that point, and returned on rollers situated between the rails of the track on the floor of the drift and through the crosscut to the plat at the shaft, where it went onto another wheel and back on the rollers on top of the crosscut. The rails of the track were about three feet apart, and the rollers on the floor were about halfway between the rails. These rollers were about five or six inches in diameter. The shaft on which the rollers were fastened turned with the rollers, and the cable would

be 2½ inches from the floor of the drift when it was running on the rollers on the floor. The tops of the rollers in the roof of the crosscut were about six inches from the roof. The rollers on the floor of the crosscut were about 20 feet apart, and those on the roof about the same distance.

The cars were iron cars. They were filled in the drift, attached to the cable, drawn to the plat at the shaft, where they were taken off the cable, and run onto the cages which elevated them to the surface. They were fastened to the cable in the following manner: There was a ring on the cable with a short piece of chain leading from it. This chain was fastened to the front end of the front car, whichever way the cars were going, by means of an iron bolt. The cars were then fastened together. There was a slight grade in the crosscut toward the shaft. The cars, being fastened to the endless cable, had no brakes upon them. The moment the cable stopped the cars stopped. If the cars were being run through the drift or crosscut at their ordinary rate, they would be stopped instantly when the power was shut off at the engine, or would stop within a few inches. These cars were ordinarily run at a speed somewhat faster than a man walks. When there was more than one party of trammers they used four cars; if there was only one they used two cars in a train.

The man or boy who operated the engine was stationed at the junction of the crosscut and drift, where he could see in both directions. He is referred to in the record as the "puffer boy," and the engine used is ordinarily called a puffer engine. When a train of cars was running through the drift, generally a man was with the cars. That man was called a conductor. He rode back and forth on the cars through the drifts and crosscuts. He was on the rear while going to the shaft. There was a signaling apparatus running

through the drift and crosscut to notify the puffer boy when to start and stop his engine. This signal wire ran to the engine and was located in the roof of the crosscut, more on the right side going in from the shaft. This signal cord was within easy reach of persons in the crosscut, and was like the bell signal in a train or street car. All that was necessary was to reach the bell rope and pull it down. The signal to stop was one bell. The conductor could reach out from his position on the train and pull the cord at any time going through the crosscut. It was customary for the men to go into the crosscut on their way to and from work. In fact this was the only way to reach their work in the drift, or drifts.

The crosscut was not lighted except by the miner's lamps, which they carried in their hats in going through the crosscut. When the cars were being run through the crosscut, it was customary to have a light placed on the front end of the front car. This light was placed on the car by the man called the conductor when he had his train made up and was ready to take it out, and he was the only man whose duty it was to place the light there. The light or lamp that was used for this purpose was an ordinary miner's lamp that burns "Sunshine" grease—the same kind of lamp that the men wear on their hats. There was a little hole on the end of the car and a hook on the lamp, and he placed the hook in the hole. In addition to the light that the conductor placed on the front of the first car, he also carried a lamp of his own on his hat.

Before entering the crosscut from the shaft the men could ascertain whether or not the cars were running by looking at the wheel at the plat around which the cable went. They could tell whether the cars were running, and in which direction they were running, by feeling the rope back of the timbers and

where the wheel was, and by watching the light. The custom was to put their foot on the rope passing the post where the wheel was.

The plaintiff was employed by the defendant as a miner, and on the day of the accident his working place was the fifteenth level of No. 3 shaft, where he was to work in a stope. In company with two other men, at about 8 o'clock in the morning, he went down in the cage and got off at the fifteenth level at the plat. Quoting plaintiff's own words, he testified:

"When I got to the mouth of the crosscut first I looked for the lights on the cars; and then Arfman, who was ahead of me, he felt the rope with his hand, and I felt with my foot. The rope was not moving then. I had two bars on my shoulders, one was 6 or 7 feet long, the other 10 feet or thereabouts, and their weight was about 30 or 40 pounds. After I felt the rope and found it not moving we started to walk in. Arfman was ahead. He might have been 10 feet or more ahead of me. I think it was somewhere around 300 feet from the shaft in the crosscut where I was injured."

As the plaintiff and Arfman were walking through the crosscut they were met and run down by a loaded train of cars, and the plaintiff was injured. On that morning the conductor had taken a train of cars in from the plat to the drift, and had taken them to a place between 900 and 1,000 feet south of the crosscut. At that point he got the loaded cars and attached them to the cable. At this point the lamp, which he ordinarily placed on the front of the head car, got broken, and on this trip, which was the first one for the day, he ran the cars out from the drift and into the crosscut without putting a light at the front of the car. The train had run a distance of 1,800 or 1,900 feet from the place where the lamp was broken to the place where the plaintiff was injured. The following uncontradicted testimony was given by the

conductor, who was called by the plaintiff for cross-examination under the statute:

"*Q.* You are the conductor that was on the train which caused the injury to Lahti?

"*A.* Yes.

"*Q.* You are the one whom the company appointed to look after the headlights on the train for the safety of the men?

"*A.* Yes.

"*Q.* You are the only one upon whom that duty was imposed?

"*A.* Yes.

"*Q.* You were supposed to keep a headlight on the train at all times for the men's safety?

"*A.* Yes.   *   *   *

"*Q.* Now, at the time the plaintiff was hurt, you were on the train, were you not?

"*A.* Yes.

"*Q.* And there was no headlight on the train?

"*A.* No.

"*Q.* There hadn't been any headlight on the train from the time you left the south end of the drift, about 1,000 feet from the place where the plaintiff was hurt?

"*A.* No.

"*Q.* And you knew that all the time, didn't you?

"*A.* Yes.

"*Q.* And didn't you put any headlight on there?

"*A.* No.

"*Q.* You ran the train without a headlight?

"*A.* Yes.

"*Q.* Now, the only thing that that headlight was on the train for was for the men's protection, to warn them that the train was coming, wasn't it?

"*A.* Yes.

"*Q.* And it was the custom of the company to at all times keep a headlight upon the trains for the safety of the men?

"*A.* Yes.

"*Q.* And they imposed that duty upon you for the safety of the men, the company did?

"*A.* Yes.

"*Q.* Now, why didn't you put a headlight upon the

train that morning while running the train in from the south end of that drift?

"*A.* Because she was broke inside.

"*Q.* The headlight was broken inside?

"*A.* Yes.

"*Q.* And by inside, you mean at the south end of the drift, do you?

"*A.* Yes.

"*Q.* And weren't you furnished with any extra headlights to use in case one got out of order?

"*A.* No.

"*Q.* You are the one whose duty it was there, under the customs and rules of the company, to keep the headlights in repair and lighted?

"*A.* Yes.

"*Q.* And you didn't have any extra one to replace the broken one at that time?

"*A.* No.

"*Q.* The defendant didn't furnish you any?

"*A.* No.   *   *   *

"*Q.* While you were riding in on the cars on that train you were on the hind car, weren't you?

"*A.* Yes.

"*Q.* On the back end of it?

"*A.* Yes.

"*Q.* How many cars were in the train?

"*A.* Two.

"*Q.* And there was no light of any kind on the front car?

"*A.* No.

"*Q.* And you hung onto the back car, stooping down low, didn't you?

"*A.* All that was above the car was my head.

"*Q.* And the cars were loaded with rock, were they not?

"*A.* Yes, with rock.

"*Q.* And the rock was heaped up over the top of the car?

"*A.* Yes.

"*Q.* And you had to keep your head down from the top so as not to strike the rollers on top?

"*A.* I did when I came close to a roller, I just ducked.   *   *   *

"*Q.* You didn't do anything else but just run that train and take care of those lights?

"*A.* That is all I did do.

"*Q.* Did you see the lights of the plaintiff or Arfman as you came through the crosscut?

"*A.* No.

"*Q.* Did you know they were in the crosscut before you heard them holler?

"*A.* No.

"*Q.* I assumed that you heard them holler; did you hear them holler?

"*A.* I did when the cars came right by them.

"*Q.* How long would it take to stop that train, after you gave a signal to stop it?

"*A.* I think about 30 feet?

"*Q.* How fast was the train going as you went through the crosscut there that morning?

"*A.* Like a man on a fast walk. Like a man would walk fast."

The undisputed evidence shows that the plaintiff, stepping to the south side of the crosscut, sought to protect himself from the on-coming train of cars, but was hit by the cars, and suffered serious injuries, which were the foundation of this action.

At the close of the plaintiff's case, and again at the close of all the evidence, the defendant moved the court for a directed verdict upon the grounds:

(1) That the evidence showed no negligence on the part of defendant, which was attributable to the defendant.

(2) That the negligence, if any, in the case was the negligence of a fellow-servant of the plaintiff, namely, the conductor on the car.

(3) That the evidence showed beyond any dispute that, as a matter of law, the plaintiff was guilty of contributory negligence.

(4) That the conditions, as shown by the testimony, established conclusively, as matter of law, that the plaintiff assumed the risk.

(5) That if there was any negligence in this case in not putting a light on the car, the testimony showed that the lamp was broken so recently before the accident that notice of that fact could not be brought home to the defendant, and until such time, or such

lapse of time, was shown to have existed, the defendant would not be responsible for the failure to place the light on the car.

Said motions were overruled, and defendant excepted. There was a verdict and judgment for the plaintiff in the sum of $3,000, and defendant has brought the case here upon writ of error; and, while there are many assignments of error, it relies, mainly, for reversal, upon the claim, under appropriate assignments of error, that the court should have directed a verdict for the defendant, because the negligence, if any, which the plaintiff alleges was the cause of his injury, was the negligence of a fellow-servant.

Although the declaration in the case alleges numerous acts of negligence on the part of the defendant, it appears from the record that the act of negligence upon which the plaintiff relied at the trial was the failure of the defendant to keep the crosscut, through which plaintiff was passing, reasonably safe, in that on this occasion a train of cars was run through the crosscut without a light on the front car. Aside from that one circumstance, we find no evidence or claim in the record that the place was unsafe.

Under the custom and the rule of the defendant, it was the duty of the conductor to run the cars through the drift and crosscut with a miner's lamp stuck on the front end of the front car. On this occasion he ran the train through without a lamp. Reduced to its simplest terms, therefore, the primary question is whether the conductor was, or was not, the fellow-servant of the plaintiff in handling his train as he did on this occasion. Defendant maintains that, under established principles, he was such a fellow-servant. The learned trial court, basing its opinion apparently upon the case of *McDonald* v. *Railway Co.*, 108 Mich. 7 (65 N. W. 597), submitted the question to the jury. It is contended by the defendant that the *McDonald*

*Case* does not warrant the ruling of the trial court, and it is urged that in that case the defect, viz., that of a cracked push bar, was a defect in a permanent part of defendant's locomotive, while in the case at bar there was no defective machinery whatever, but the negligence consisted solely in the failure of the conductor, in properly making up and equipping his train before taking it through the crosscut. In other words, it is a case of the disobedience of the conductor in not complying with his instructions and the rules of the company. It is urged on behalf of defendant, as distinguishing the instant case from the *McDonald Case*, that the trains which were run through the crosscut were not made up in any particular or special manner; that there were a great many tram cars in use, all being alike; that the lamp was an ordinary miner's lamp such as the men wore in their hats, and was not fastened permanently to any car, but was temporarily stuck in whichever car happened to be in front of the train; that the cars that were taken to the plat filled with rock were not taken right back, but the conductor took in whatever empty cars that were there; that similarly when he arrived inside at the drift he left his empty cars there, and took out such as were filled; that consequently he had to change the position of this lamp a great many times a day, and on each trip, whether in or out, had to place his lamp on a different car; that there were a great many similar lamps in the drift at the time he left it, and each man had one, and there were many men there, and that the conductor had another lamp like it on the way out on the cars, but he carried it on his hat; that the headlight or lamp on the front end of this train of cars was therefore not an appliance of a permanent nature, fastened to the car, which could be kept in condition by the inspection which the master ordinarily owes, in order to keep appliances in a rea-

sonably safe condition, and that the placing of the
lamp on the front car before taking the train through
the crosscut was one of the duties incident to the
making up of the train, and was a mere detail of its
operation; that to require an independent inspector
to see that this servant did his duty of attaching the
cars to the cable, putting the lamp on the front car,
and giving the proper signals, would be carrying the
rule far beyond the limits contemplated by the de-
cisions, and that it is well-established that an em-
ployer who furnishes a safe place, proper machinery
and appliances, and competent men to perform the
work is not required to personally superintend all the
details of the work, and cannot be held liable for every
negligent act of his employee in the use of such ma-
chinery and appliances.

It is also urged by the defendant that the instant
case cannot be distinguished from numerous cases de-
cided by this and other courts of last resort, holding,
under facts similar to those in this case, that the in-
jured party and the man in charge of the machinery,
or appliances, were fellow-servants. We have read
with great care the opinions in the *McDonald Case.*
Even the opinion of Justice MONTGOMERY deals with
the matter of inspection and the discovery of defects
in machinery. It is well that we should note that in
that case there was also an additional cause of the
injury in the failure of a brake and reverse gear to
work, which caused an extra strain to be put upon
the defective push bar; and the opinion of Justice
HOOKER approves the holdings of this court in *Smith*
v. *Potter,* 46 Mich. 258 (9 N. W. 273, 41 Am. Rep.
161), where the failure of the yard inspector to de-
tect a defect in a car received from another road was
held to be the negligence of a fellow-servant, and of
*Dewey* v. *Railway Co.,* 97 Mich. 329, 333 (52 N. W.
942, 56 N. W. 756, 16 L. R. A. 342, 22 L. R. A. 292,

37 Am. St. Rep. 348), where a similar ruling was made, and also *Miller* v. *Railway Co.*, 90 Mich. 230 (51 N. W. 370), and *Jarman* v. *Railway*, 98 Mich. 135 (57 N. W. 32), both of which latter cases were in line with the first-mentioned cases, and Justice HOOKER there said:

"It was the duty of the defendant to furnish machinery in a reasonably sound and safe condition, and to use ordinary care in keeping the same in repair. This is an absolute duty, which the master cannot relieve himself from by imposing it upon another. There is no claim that defendant did not furnish a reasonably safe push bar. If there is liability, it must be based upon a failure to use proper care in discovering and remedying the defect. If there was negligence in this, it was either a failure to prudently inspect, or by reason of the use of the defective push bar after inspection. The record shows that there was no provision for inspection other than inspection by the engineer operating the train. He was expected to inspect his engine at all practicable times, and to report defects. This was no more than common prudence dictates should be required of all operatives of railway trains, and it is to be considered as a part of their duties in and about the operation of their trains; and this is as true when the railroad company makes no other provision for inspection as when it has another regular inspector. Such inspection, in the ordinary operation of the road, is the act of a fellow-servant, as between the engineer and brakeman, and, as between them, does not constitute the engineer a representative of the master. To say that an engineer who should err in attempting to make the next station, after his engine became broken, acted as the representative of his master, thus holding the latter liable to the fireman, who was injured, would be carrying the rule too far. An unreported injury of the brakes known to the brakeman would be another illustration. The duty that the master owes to his patrons requires vigilance and care upon the part of the crew, and the master should be permitted to require it without subjecting himself to all the consequences following negligence by an inspector proper.

The duty of such inspection should not be imposed upon operators of trains or machinery at the master's peril. If he provides for the discovery of defects and repair of his machines with reasonable diligence, it should be enough; and he should be allowed to provide additional precautions and safeguards, through the vigilance of operatives. To hold otherwise would put a premium upon carelessness."

Then follows the reference to the cases cited above.

Attention is also called to the later language of Justice HOOKER, in the opinion, calling attention to the proper submittal to the jury of the question of concurrent negligence of the engineer and that of the defendant. It seems to us that there was no failure of inspection in the instant case; that the duty of placing a miner's lamp on the front car of the train, before making a trip through the crosscut, was one which, by its very nature, had to be performed a great many times during the day, and one which required from the servant no skill, but merely obedience to the orders of the employer. His failure to so place the lamp was purely a failure to perform a detail of his work in preparing the cars, and, as such, was the act, it seems to us, of a fellow-servant of the plaintiff, for whose negligence the defendant should not be held liable. It is hard to conceive how this case can be distinguished from the case where the engineer, or servant, fails to light the headlight on a locomotive before starting on a trip, or a brakeman who fails to give a proper signal of warning, or a yardman who sends out a car improperly loaded, all of whom have been repeatedly held to be acting in a purely ministerial manner, and not in a representative capacity. There is no evidence in the case that the lamp was liable to be broken that day, or ever had broken before, or that it was necessary, in the operation of the trains, to provide at the plat in the crosscut, or in the drift, duplicate parts for the very simple machinery oper-

ated by the conductor. In fact there is no claim of
negligence on the part of the defendant in failing to
keep duplicate parts, alleged in the declaration, nor
was any such claim set up or relied upon at the trial.
The evidence in the case shows affirmatively that the
train had never been run before without the light in
front, and therefore the defendant had no notice that
such a thing was likely to occur. Unless notice to the
conductor was notice to the defendant, the latter can-
not be charged with notice of the breaking of the lamp
before the accident occurred. The defendant had fur-
nished a safe place, safe machinery and appliances,
and a competent servant to operate them. It is diffi-
cult to say in what respect it failed in any duty toward
the plaintiff. In the light of the following decisions
of this court, we are constrained to hold that the
learned trial judge should have directed a verdict for
the defendant, upon the ground that the conductor
was the fellow-servant of the plaintiff. We think this
view of the case is fully sustained by the following de-
cisions of this court. We shall quote from two only:
*Smith* v. *Potter, supra; Greenwald* v. *Railway Co.*, 49
Mich. 197 (13 N. W. 513); *Henry* v. *Railway Co.*,
49 Mich. 495 (13 N. W. 832); *Peterson* v. *Railway
Co.*, 67 Mich. 102 (34 N. W. 260, 11 Am. St. Rep.
564); *Bergstrom* v. *Staples,* 82 Mich. 654 (46 N. W.
1035); *Miller* v. *Railway Co., supra; Baron* v. *Navi-
gation Co.*, 91 Mich. 585 (52 N. W. 22); *Dewey* v.
*Railway Co., supra; Jarman* v. *Railway Co., supra;
Schroeder* v. *Railroad Co.*, 103 Mich. 213 (61 N. W.
663, 29 L. R. A. 321, 50 Am. St. Rep. 354); *Loranger*
v. *Railroad Co.*, 104 Mich. 80-87 (62 N. W. 137);
*Henning* v. *Foundry Co.*, 112 Mich. 616 (71 N. W.
156); *Frazee* v. *Stott,* 120 Mich. 624 (79 N. W. 896);
*Miller* v. *Railroad Co.*, 123 Mich. 374 (82 N. W. 58);
*Lellis* v. *Railroad Co.,* 124 Mich. 37 (82 N. W. 828,
70 L. R. A. 598); *Jurkiewicz* v. *Car & Foundry Co.,*

147 Mich. 622 (111 N. W. 183) ; *Dixon* v. *Railway Co.,* 147 Mich. 667 (111 N. W. 200), and 155 Mich. 169 (118 N. W. 946) ; *Wickham* v. *Railway,* 160 Mich. 277 (125 N. W. 22, 52 L. R. A. [N. S.] 1082, 136 Am. St. Rep. 436, Am. & Eng. Ann. Cas. 1913E, 1069) ; *Stever* v. *Railroad Co.,* 160 Mich. 207 (125 N. W. 47, 52 L. R. A. [N. S.] 1139).

In *Dixon* v. *Railway Co., supra,* the plaintiff, a crossing tender in defendant's employ, alleged that he was injured through the negligence of defendant in not keeping a certain switch east of the crossing, at which plaintiff was assigned, securely locked and fastened when not in use, and by reason of which a part of a train passing the crossing ran off the track and struck him. When the case was first here Justice BLAIR, speaking for the court, said:

"We think that the court erred in holding that the doctrine of safe place applied to this case. The duty of keeping switches closed and locked while not in use was not one of the absolute duties of the defendant, but an assignable duty, relating to a detail of operation which could properly be delegated to an employee" (citing cases).

When the case was here the second time, the following language was used by Justice HOOKER:

"As we said in our former opinion, if the accident was due to negligence, it was that of a fellow-servant, for which the master is not liable."

In *Miller* v. *Railroad Co.,* 123 Mich. 374 (82 N. W. 58), the plaintiff was the foreman of a section gang, and was struck and injured by a piece of timber projecting from a flat car. The conductor and the brakeman of the train crew placed the timbers on the flat car, but failed to comply with the rules prescribed .by the defendant, with which they were familiar, for the proper loading of cars, in that they did not use a sufficient number of stakes to secure the timbers prop-

186 Mich.—3.

erly upon the car. In an opinion reversing a judgment for the plaintiff this court, speaking through Justice MOORE, said:

"The trial judge was in doubt as to whether he ought to have charged the jury that the conductor and the station agent who were responsible for the loading of the timber, were fellow-servants with the plaintiff or not. He expressed himself as of the opinion that the cases decided in this court were not harmonious, and that under the later cases he ought to allow the case to go to the jury. He doubtless referred to the cases of *Balhoff* v. *Railroad Co.*, 106 Mich. 606 [65 N. W. 592]; *Anderson* v. *Railroad Co.*, 107 Mich. 591 [65 N. W. 585]; *McDonald* v. *Railroad Co.*, 108 Mich. 7 [65 N. W. 597]. A reference to these cases will show that each of them announced the doctrine that it was the duty of the master to provide a reasonably safe place to work, and machinery, tools, or appliances in a reasonably safe condition with which to work, and that this was a duty which could not be delegated by the master so as to escape liability. If the master has provided a safe place to work, or tools, machinery, and appliances reasonably safe with which to work, these cases do not indicate that the negligent use of these things by a fellow-employee would make the master liable. These cases, as applied to the testimony in the case at bar, restricted as it was by the court to the third count in the declaration, did not justify a submission of the case to the jury upon the theory that the station agent and conductor were not fellow-servants. In that respect the case is controlled by *Dewey* v. *Railway Co.*, 97 Mich. 329 [62 N. W. 942, 56 N. W. 756, 16 L. R. A. 342, 22 L. R. A. 292, 37 Am. St. Rep. 348]; *Jarman* v. *Railway Co.*, 98 Mich. 135 [57 N. W. 32]; *Loranger* v. *Railway Co.*, 104 Mich. 80 [62 N. W. 137]; and *Frazee* v. *Stott*, 120 Mich. 624 [79 N. W. 896]. The last-named cases all relate to the negligent use by fellow-servants of cars, machinery, or appliances which were reasonably safe for the purposes for which they were intended. Under such circumstances it is held that the negligence of the fellow-servant does not make the master liable. If the dis-

tinction we have pointed out is borne in mind, we think it will be found the decisions are not inharmonious."

We have not omitted to examine the cases cited by plaintiff's counsel. In our opinion *Murphy* v. *Dredge & Dock Co.*, 175 Mich. 216 (141 N. W. 564), can readily be distinguished from the instant case. In that case the defendant had not provided such a reasonably sufficient lighting system as to render the operations safe for its employees. Manifestly that is not this case. Here the conductor had been instructed, and it is undisputed, that it was his duty to put a lighted lamp upon the front of every train. He violated his instructions and moved his train without a light.

The case of *Kaukola* v. *Mining Co.*, 159 Mich. 689 (124 N. W. 591), is also cited. There we applied the rule of safe place, and held that it was the duty of the company to provide a safe passageway for its employees to prevent their falling into a trap or excavation while going to their work. Here no complaint is made of the safety of the passageway, had the conductor followed his instructions and placed the simple appliance of a lamp in front of the train. We do not think that anything that was said by us in the *Kaukola Case* is controlling of the instant case.

We have examined the other cases cited by counsel and think they are readily distinguished. Counsel for both parties have cited many cases outside this State. While we have examined some of them, we are of opinion that the subject under consideration has been covered by our own decisions, and deem it unnecessary to cite the numerous authorities from other jurisdictions.

We are of opinion that by the undisputed testimony and for the reasons stated, the trial court should have directed a verdict for the defendant. This disposition

of the case renders it unnecessary to consider the other questions discussed by counsel.

For the reasons pointed out, the judgment of the circuit court is reversed, and no new trial granted.

Brooke, C. J., and McAlvay and Steere, JJ., concurred with Stone, J.

Bird, J. (*dissenting*). I am unable to agree with the conclusion reached by Mr. Justice Stone, that this case should be reversed. The place in which the plaintiff was injured was not one which was in the process of making. It was a permanent place, provided with a railway and cars, and was also used as a passageway for the employees going to and from their work. When the defendant put the passageway to this joint use, it was bound to keep it reasonably safe for the passage of the employees, and to keep it reasonably safe for them it was necessary to light it. Of the many ways in which this might have been accomplished, the defendant chose to light it by a lamp carried on the front end of the train. If the burden was on the conductor to keep the light on the car, in this respect he was acting for the master, and as to such duty was not a fellow-servant of the plaintiff. It will not do to dispose of the question by saying that the passageway became unsafe by reason of negligent operation. If the place had been made safe in the first instance by the master, and had subsequently become unsafe by reason of operation, of course the master would not be liable, but the difficulty of applying this rule is the fact that the place was never safe for the joint use of the cars and employees unless it was lighted. The lighting was a necessity which preceded operation, and operation could not be carried on in a reasonably safe manner until it was accomplished. As was said in *Kaukola* v. *Mining Co.*, 159 Mich. 689

(124 N. W. 591), where a like question was very ably discussed:

"The lighting of this passageway or thoroughfare of the mine, far distant from the working places of most of those who passed through them—it being always dark in the mine—was just as necessary for the safety of the men as it was to have the walls and floors in a proper condition. It was one of the 'instrumentalities' which it was necessary to provide to enable the men to do their work, and to get to and from their work safely. It was a thing which it was necessary to keep permanently in condition."

I am unable to distinguish this case from *Kaukola* v. *Mining Co., supra,* and *Murphy* v. *Dredge & Dock Co.,* 175 Mich. 216 (141 N. W. 564), recently decided by this court, and I think this case should follow them, and the judgment should be affirmed.

KUHN and MOORE, JJ., concurred with BIRD, J. OSTRANDER, J., did not sit.